**AMOCO OIL COMPANY, in personam, Appellant,**

v.

**H. GRUNEWALD & COMPANY, Appellee.**

No. 78–1164.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 10, 1979.

Decided Feb. 15, 1979.

Herbert Kelly, Newport News, Va. (Harry J. Kostel, Jones, Blechman, Woltz & Kelly, Newport News, Va., on brief), for appellant; Walter B. Martin, Jr., Norfolk, Va. (Vandeventer, Black, Meredith & Martin, Norfolk, Va., on brief), for appellee.

Before BUTZNER and WIDENER, Circuit Judges, and JACK R. MILLER, Judge, United States Court of Customs and Patent Appeals, sitting by designation.

JACK R. MILLER, Judge:

This is an appeal from the judgment of the district court, following trial without a jury, awarding plaintiff, H. Grunewald & Company (hereinafter "Grunewald"), the sum of $42,181.80 against defendant, Amoco Oil Company (hereinafter "Amoco"). We reverse.

Suit was brought by Grunewald against the SS Ginevra, *in rem,* her owners, Sicula Partenopea di Navigazione, S.p.A., *in personam,* E. S. Saybolt & Co. (hereinafter "Saybolt"), *in personam,* and Amoco, *in personam.* The action arose from delivery by

the SS Ginevra of a cargo of No. 6 fuel oil, loaded at Milazzo, Italy, on October 29, 1974, to Amoco's Yorktown, Virginia, refinery on or about November 20, 1975. The judgment award against Amoco represents the difference between the stipulated value (at $11.45 per bbl.) of 221,072 barrels of oil (less 189 barrels found to be nonpumpable), loaded at Milazzo and gauged and found on board by Saybolt before discharge, and 217,199 barrels of the oil, gauged by Saybolt from one of Amoco's storage tanks following delivery.[1] Saybolt was an independent petroleum inspector whose fees were split between Grunewald and Amoco under their written contract. The action was dismissed as to all defendants except Amoco.

The district court found that upon completion of discharge of the vessel's tanks, Saybolt, accompanied by a representative of Grunewald and Amoco, gauged the tanks and found them empty; that a "dry certificate" indicating that the vessel's cargo had been completely discharged was issued by Amoco to the vessel's master; that title passed to Amoco as the oil passed the flange connection between the vessel's cargo discharge manifold and the receiving hose of Amoco on the pier at Yorktown approximately at the side of the vessel; that there was no evidence of any overboard discharge before entering the Amoco pipeline or leakage on board the vessel before delivery to Amoco; and that the entire cargo of 221,072 barrels of oil (less the 189 barrels found to be nonpumpable), was delivered to Amoco in the pumping process.

Amoco points to a certificate in the record executed by Saybolt's representative, certifying that only 217,199 barrels of oil were delivered to Amoco, and argues that the measurements were conducted in accordance with Article VI ("DETERMINATION OF QUALITY AND QUANTITY"), Section 6.2, of the contract which provides:

> 6.2—The quantity of oil delivered shall be determined at the discharge port by taking the temperature of and measuring and gauging the oil either in the receiving tanks both immediately before commencement and after completion of discharge of each cargo, or by using meters where approved by the inspector. Temperature correction to 60°F. shall be made in accordance with Table No. 6 of the 1952 Petroleum Measurement Tables of the American Society for Testing Materials and the Institute of Petroleum (ASTM Designation: D 1250; IP Designation: 200) or such other standards as the parties hereto may agree in lieu thereof.

The district court also found that Saybolt read Amoco's gauges in Amoco's pump house. Although this would appear to constitute the alternative method specified in the contract of "using meters . . . approved by the inspector," the court inexplicably said that there was "no evidence" of the use of "approved meters." The district court further found that there was "no independent measuring or gauging the oil in the tanks"; that there was considerable evidence from responsible Amoco employees that the Amoco gauges in its pump house "have, on many occasions, been found to be in error when checked by manual measurements of the oil in the tanks"; that a comparison check was made on a regular monthly basis; that nine days after the unloading of the Ginevra there was an error between the pump house gauge and its 500,000 barrel tank of a depth of 2½ inches; and that Saybolt's representative had seen discrepancies between actual quantity and gauge readings. The court said that the possibility that the oil collected in various tanks other than the measured tank or in various pipelines in the Amoco compound before measurement of the tank was "an assumption that the Court could make if necessary."

Amoco's response is that, assuming, for the sake of argument, use of Amoco's gauges was not covered by the contract, it did not direct Saybolt how to conduct the measurements and should not be held liable because the common agent of Grunewald and Amoco did not elect to perform independent

---

1. Grunewald sued for $44,345.85, but this was reduced in computing the judgment award to take into account the 189 barrels found to be nonpumpable.

measuring or gauging.[2] It cites 2A C.J.S. Agency, § 245, for this statement of the law:

§ 245. Joint Principals and Several

Where several principals, for their mutual interest and advantage, as joint principals, employ a common agent, they all become bound by the acts of such agent within the scope of his authority and they must share the consequent responsibility of acts done or representations made by the agent. One principal cannot charge the other not actually at fault with any misconduct of the common agent, since the common agent owes no more duty to one than to the other; and one principal may not sue his co-principals for the dereliction of their common agent. [Footnotes omitted.]

Amoco contends that, under Article VI, Section 6.1 of the contract, Saybolt's measurements and certificate were "conclusive and binding" upon the parties. That section provides:

Section 6.1—The quantity and quality of oil sold hereunder shall be determined by an independent petroleum inspector. Such inspector shall be appointed jointly and the cost of his services shall be shared equally by the parties. The inspector's determinations as to quantity and quality shall be conclusive and binding upon both parties.

Amoco further contends that Grunewald's invoice to Amoco "clearly demonstrates that plaintiff understood that it was to receive payment only for the oil received in Amoco's tank based on the Saybolt certification." The invoice states:

Re.: TS "Ginevra" lsfo I % max. cif Yorktown your installation

In accordance with the Saybolt figures we herewith charge you with lsfo cif Yorktown 217,299 bbl [3] at US$ 11.45 per bbl 2,488,073.55

Grunewald cites Article IV ("DELIVERY") of the contract, which provides:

Section 4.1—The vessel shall discharge the oil at the discharge port named in the attached Sale Binder. Title to the oil and risk of loss thereof shall pass to BUYER when the oil passes the flange connection between the vessel's cargo discharge manifold and the delivery hose at the port of discharge; provided, however, that any loss or damage of the oil during discharge, caused by the fault of the receiving facilities, shall be for the account of BUYER. Delivery and purchase of oil provided for hereunder shall be deemed to occur when title to the oil and risk of loss thereof passes to BUYER at the discharge port.

However, we agree with Amoco that the dispute in this case is controlled by Article VI. Grunewald also argues that Article VI presupposed that the equipment used for measurement was accurate; further, that the Amoco gauges used by Saybolt were not operating properly. Nevertheless, we are satisfied that, in the absence of evidence of bad faith, Article VI was designed to preclude such an argument.

Apparently overlooked by the parties and the district court is Article IX ("GOVERNING LAW"), which provides:

Section 9.1—This Agreement shall be construed according to and shall be governed by the laws of the State of New York, excluding any choice-of-law rules

---

**2.** Amoco quotes the following from Grunewald's Amended Complaint:

16. The damages recited in paragraph 15 were caused by:

. . . .

f. The negligence of SAYBOLT & CO. in improperly measuring and reporting the quantity of outturn at Yorktown, Virginia.

. . . .

18. The damages . . . were caused by:

. . . .

f. The breach of warranty by SAYBOLT & CO. to plaintiff to properly measure and report the quantity of outturn at Yorktown, Virginia.

**3.** The discrepancy between the invoice figure of 217,299 barrels and the figure of 217,199 barrels in the Saybolt certificate is unexplained.

which may direct the application of the laws of another jurisdiction.

In *Rodgers v. Ward,* 169 Misc. 559, 8 N.Y. S.2d 167, 168 (1938), *aff'd,* 256 App.Div. 986, 11 N.Y.S.2d 240 (1939), the court quoted approvingly from 3 C.J.S. Agency § 260 as follows:

> Where an agent represents two adverse parties in a transaction with the knowledge and consent of both, neither principal is liable to the other for the tortious act, of the agent so situated where he in no way participates in the tortious act, but he may be held liable to the other principal where he is directly connected with the tort committed by the agent.[4]

The current edition of Corpus Juris Secundum contains substantially the same statement in Agency § 430. *See also* 2A C.J.S. Agency § 245, quoted *supra.*

Although Saybolt's role was not that of an arbitrator[5] and was more in the nature of that of an appraiser,[6] the comment of one New York court regarding arbitration readily applies to the provision in Section 6.1 of the contract under which Saybolt's determination with respect to quantity "shall be conclusive and binding upon the parties." In *Prosperity Co. v. American Laundry Machinery Co.,* 271 App.Div. 622, 67 N.Y.S.2d 669, 677, *aff'd,* 297 N.Y. 486, 74 N.E.2d 188 (1947), the court said:

> [A]greements of arbitration, like all other contracts, are *considered inviolable by this State* and . . . the public policy of the state approves of arbitration as a method of disposing of disputes in business matters in the most expeditious orderly manner. [Emphasis supplied.]

*See also Gilbert v. Burnstine,* 255 N.Y. 348, 174 N.E. 706 (1931) (agreement to arbitrate all differences "at London pursuant to the Arbitration Law of Great Britain" not contrary to public policy).

■ In view of the foregoing, we hold that, under the law of the State of New York, the determination by Saybolt of 217,199 barrels of oil following delivery to Amoco is conclusive and binding upon the parties under their contract[7] and that Amoco is not liable to Grunewald as a consequence of any error attributable to Saybolt.

The decision of the district court is reversed, and the case is remanded for such further proceedings, consistent with this opinion, as the district court may determine.

---

**4.** Although the facts in that case were considerably different from those involved here, the principle enunciated is clearly applicable to this case. Also, we note that there is no evidence showing that Amoco directed Saybolt how to conduct the measurements.

**5.** Article VIII ("ARBITRATION") of the contract provides:

> Section 8.1—Any controversy or claim arising out of or relating to this Agreement or breach thereof shall be settled by arbitration in accordance with the rules of the American Arbitration Association or such other rules as it may designate. This agreement shall be enforceable and judgment upon any award rendered by all or a majority of arbitrators may be entered in any court of any country having jurisdiction and shall be binding upon the parties.

In the district court Amoco filed a motion to stay proceedings pending arbitration, but subsequently decided to submit to the jurisdiction of the court rather than to arbitration.

**6.** *See Sanitary Farm Daries v. Gammel,* 195 F.2d 106 (8th Cir. 1952); *Syracuse Sav. Bank v. Yorkshire Ins. Co.,* 301 N.Y. 403, 94 N.E.2d 73 (1950).

**7.** We do not regard a 1.7% difference between the amount of oil measured before discharge and the amount determined by Saybolt to have been delivered to be of such magnitude as to justify an inference of bad faith or as to represent such gross error that the conclusiveness of Saybolt's determination is to be ignored. *See Korein v. Rabin,* 29 A.D.2d 351, 287 N.Y. S.2d 975, 980 (1968).