**CITIES SERVICE COMPANY, INC., Plaintiff,**

v.

**DERBY & CO., INC., Defendant.**

**No. 82 Civ. 0682 (SWK).**

United States District Court, S.D. New York.

Feb. 20, 1987.

Hill, Betts & Nash by Allan J. Graf, New York City, for plaintiff.

Windels, Marx, Davies & Ives by Robert J. Lynch, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

The above-captioned matter was tried by the Court without a jury. The Court's findings of fact and conclusions of law are set forth below.

## INTRODUCTION

Subject matter jurisdiction in this contract action is founded on diversity of citizenship under 28 U.S.C. § 1332. Plaintiff seeks to recover judgment in the amount of $374,225.76 by reason of defendant's alleged failure to pay for 9,474.07 barrels of crude oil delivered by plaintiff to defendant pursuant to a January 30, 1981 contract, together with pre-judgment interest.

## FINDINGS OF FACT

Plaintiff Cities Service Company, Inc. ("Cities") and defendant Derby & Co., Inc. ("Derby") entered into a contract on January 30, 1981 for a barrel-for-barrel exchange of crude oil by which Cities was to deliver to Derby Libyan Amna crude oil in exchange for Derby's delivery to Cities of Nigerian Forcados crude oil.

*The Contract*

The contract contains a choice of law clause under which it is to be "construed and governed by the laws of the State of New York." The contract provides that, in the event that the delivered quantities of oil are not identical, such imbalance will be purchased from the overdelivering party.

The value of each barrel of Forcados crude was fixed at $40.25 per barrel for the first 5,000 barrels and $39.50 per barrel thereafter. The value of the Amna crude was fixed at $39.50 per barrel.

The quantity of crude oil delivered was on the basis of net barrels discharged into shore tanks as determined by an independent inspector mutually agreed upon by Cities and Derby. With regard to the independent inspection, the contract provides:

ARTICLE IV—QUANTITY/QUALITY DETERMINATION

SECTION 4.1 The quantity and quality of the Oil shall be determined by an independent inspector at the discharge port, such independent inspector shall be appointed jointly and the cost of his services shall be shared equally by the parties. All determinations as to quantity and quality made in accordance with the provisions of this Section 4.1 shall be conclusive and binding upon both parties.

SECTION 4.2 The quantity of each cargo shall be determined by taking the temperature of and measuring and gauging the Oil either in the shore tanks to which delivery is made, both immediately before and immediately after delivery or by using meters where meters are available. Temperature corrections to 60° F shall be made in accordance with the latest edition of Table No. 6 of the Petroleum Measurement Tables of the American Society for Testing and Materials (ASTM designation D1250) in conjunction with American Petroleum Institute (API Standard 2540) and Institute of Petroleum (IP designation 200) or such other standards as the parties hereto may hereafter agree shall be used in lieu thereof. If meters are used, built-in temperature compensators may be employed.

SECTION 4.3 The person performing the inspection function under Section 4.1 shall take samples of the Oil from the vessel's tanks that are to be discharged and shore tanks before and after discharge. Tests to determine quality shall be made from such samples and shall be made in accordance with standard test methods generally accepted in the petroleum industry. Such test methods are those available in the official publications of Standards Organizations such as American Society for Testing and Materials (ASTM), Institute of Petroleum (IP) or Natural Gas Processors Association (NGPA). Other test methods may be used for those qualities where such methods either do not exist in ASTM, IP or NGPA publications on the date of this Agreement or where such other methods are demonstrably superior.

Derby, in turn, contracted to sell the crude oil which it purchased from Cities to Seaview Petroleum Company, Inc. ("Seaview") in a "back-to-back" transaction. Accordingly, Derby used the Amna crude oil to be delivered by Cities to meet its obligation to deliver Amna crude oil to Seaview. And, at Derby's instruction, Cities actually delivered the Amna crude oil which it had sold to Derby to Seaview's shoreside storage tanks in New Jersey.

Cities purchased the Libyan Amna crude oil from Occidental Petroleum Company ("Occidental") and arranged for delivery by chartering the tanker HELLESPONT PRIDE from the Marathon Oil Company ("Marathon").

*The Independent Inspectors*

Caleb Brett & Son, Ltd. ("Caleb Brett"), an independent petroleum inspection company, was designated jointly by Cities, Occidental and Marathon as the inspection company to attend the HELLESPONT PRIDE at the loading of the cargo at the Mobil loading terminal at Ras Lanuf, Libya. Pursuant to their contract, Cities and Derby originally had discussed the appointment of Caleb Brett as the independent inspector to attend the delivery of the cargo. After Derby decided to use the Amna crude oil being delivered by Cities to fulfill its obligations under Derby's contract with Seaview, Derby requested Seaview to agree to the appointment of Caleb Brett as the independent inspector. Seaview refused to accept Caleb Brett and insisted upon the appointment of E.W. Saybolt &

Company ("Saybolt"), another independent petroleum inspection company. Cities agreed to accept Saybolt as the jointly appointed inspection company but retained Caleb Brett for its own account to inspect the cargo at discharge. Seaview retained Herman Runne ("Runne") as a surveyor and inspector for its own account.

Cargoes of crude oil typically contain a quantity of water, which is deducted from the overall volume of the cargo, to arrive at the net quantity of crude oil delivered. The water in cargoes of crude oil exists either as "free water", i.e., water which has precipitated out of the crude oil and is readily identifiable as water separate from the oil, or as "sediment and water" ("S & W"), i.e., emulsified water which is dispersed as a colloidal suspension within the oil. To determine the quantity of S & W in the oil, a proper representative sample of the cargo must be taken by the independent petroleum inspector and subjected to laboratory analysis. The amount of water in suspension is then represented as a percentage of the overall volume of the cargo and deducted therefrom, together with the amount of free water, to determine the net quantity of crude oil delivered. The representative sample taken by the inspector is also used to make a laboratory analysis of the other basic characteristics of the oil, such as gravity, sulfur content and mineral content.

The dispute in this case involves the amounts which Saybolt deducted from the cargo as water, both free water and S & W, in certifying the net quantity of crude oil delivered by the HELLESPONT PRIDE. Cities asserts that Saybolt miscalculated and overstated the amount of water in the cargo, and thereby permitted Derby, and ultimately Seaview, to receive an amount of crude oil without having to pay for it.

*The Cargo Loading Inspection in Libya*

The HELLESPONT PRIDE loaded the cargo of Amna crude oil at Ras Lanuf, Libya at the loading terminal operated by Mobil on February 2, 1981. Prior to the loading of the cargo, Caleb Brett inspected the cargo tanks and the designated slop

tanks of the HELLESPONT PRIDE and reported that (1) the two slop tanks contained 998 barrels of "slops", which consisted of 732 barrels of oil and 266 barrels of free water; (2) Port Tanks 1 and 3, Starboard Tanks 1 and 3, and Center Tank 5 contained a total of 714 barrels of sediments and residues from previous cargoes; and (3) Center Tank 4 contained 62 centimeters of water prior to loading.

The loadport terminal at Ras Lanuf reported that 420,973 barrels of Amna crude oil had been loaded by the terminal onto the HELLESPONT PRIDE, and the bill of lading that was issued indicated 420,973 barrels as the loaded quantity. The reported API gravity of the cargo was 36.0. The ullages of the HELLESPONT PRIDE on sailing from Ras Lanuf were calculated to be 421,872.3 barrels, which represented the total volume of liquid on board at sailing.

Caleb Brett conducted a final inspection of the vessel's tanks after completion of loading and prior to sailing and found a total of 243 barrels of free water in Port Tanks 1, 2 and 3 and Starboard Tanks 1 and 3. A note of protest was issued to the loadport terminal protesting the presence of free water in the cargo. Caleb Brett also took water samples of the free water found in the cargo from Port Tank 2, of the seawater from the loading terminal berth, and of the vessel's water from Center Tank 4, and retained them for laboratory analysis.

*The Cargo Discharge Inspection in New Jersey*

The HELLESPONT PRIDE berthed at the Mantua Terminal in New Jersey on February 28, 1981. Shortly after, Saybolt, Caleb Brett and Runne boarded the vessel and commenced inspection and sampling of the cargo. Also present during the inspection was an official from the United States Customs Service.

Saybolt, Caleb Brett and Runne jointly inspected all 15 of the tanks of the HELLESPONT PRIDE before the discharge of the cargo began. Saybolt, Caleb Brett and Runne jointly took ullages of the tanks containing cargo. Based on the ullages,

the gross volume (corrected for temperature) of liquids loaded on the HELLESPONT PRIDE was determined to be 421,980 barrels by Saybolt, 422,151 barrels by Runne and 422,198 barrels by Caleb Brett.

After the ullages were taken, Saybolt, Caleb Brett and Runne jointly measured the free water content of each tank containing cargo by gauging the tanks with a free water paste. Saybolt, Caleb Brett and Runne jointly found 9,336.1 barrels of free water. At loadport, only 243 barrels of free water had been found by the Caleb Brett inspector. Free water is water which is no longer emulsified or held in suspension in oil. According to the definition of the American Petroleum Institute, free water is "clearly and separately identifiable water." Since water is heavier than oil, water which is emulsified or held in suspension in oil has a tendency to precipitate out of the oil. The rate at which water will fall out of suspension depends primarily on the gravity and temperature of the oil. The higher the gravity and the higher the temperature of a crude oil, the greater will be the rate of water precipitation. Amna crude oil, with an API gravity above 35, is classified as a "light" crude oil. The ability of Amna crude oil to retain water in suspension or emulsion is very limited. The quantity of S & W which remains entrained or suspended in oil is measured by subjecting a properly drawn and representative sample of the oil to one of several standard testing techniques. In sales of crude oil, free water and S & W are generally non-merchantable products and are to be excluded from the determination of the delivered quantity of crude oil.

After the gauging of the free water in the tanks, Caleb Brett and Saybolt went off separately to draw samples of the cargo from the ship's tanks in order to make up the composite sample for laboratory testine. Runne accompanied Saybolt.

Saybolt used a standard one quart weighted sample bottle. The bottle had a stopper or cork and was attached to a measuring tape, which is raised and lowered by means of a reel. Saybolt took approximately a one quart sample from each of the cargo tanks and approximately a one-half quart sample from each of the designated slop tanks.[1] In each of the twelve tanks sampled, Saybolt lowered the stoppered or corked sample bottle to the bottom of the tank, raised the sample bottle to a level above the free water zone, which was between ten and twelve feet above the bottom of the tank, pulled the stopper or cork out of the bottle and then raised the bottle to the top of the tank. Saybolt poured the individual samples, totalling approximately 11 quarts, collected from each of the ten cargo tanks and the two designated slop tanks into a five gallon can. After all the samples were taken, Saybolt and Runne shook the five gallon can back and forth several times. Saybolt then poured some of the oil into three one-gallon cans. One can was given to the United States Customs Service; one was given to Runne; and one was given to the terminal representative. The remaining oil was delivered to the Saybolt laboratory for quality analysis.

Caleb Brett used a standard one quart weighted sample taker. The sample taker was attached to an 80 foot cord. Caleb Brett tied a knot between eight and ten feet from the end of the rope as a guide for keeping the sample taker between eight and ten feet above the bottom of each tank and out of the free water zone, raised the unstoppered sample taker up to the top of the tank, and poured the individual samples into a five gallon can. After all the samples were taken, Caleb Brett delivered the can to its laboratory for quality analysis. The evidence indicates that the Caleb Brett samples conformed to accepted sampling techniques of the petroleum industry.

Prior to commencing the discharge of the cargo, Saybolt sampled the two Seaview shore tanks and determined them to con-

1. The slop tanks are clearly marked and designated "Slop" on the hatch cover. Saybolt was aware that those tanks were marked slop tanks but also determined that the slop tanks contained cargo on this voyage. Saybolt also saw the Dry Certificate and Slop Certificate.

tain approximately 16,160 barrels of residual oil and 75 barrels of free water and 3,343 barrels of residual oil and a trace of free water, respectively. The gravities of the residues, including water were 25.1 and 25.4, respectively. No sample of the contents of the shore tanks was taken by either Saybolt or Caleb Brett, and the S & W content of the residual oil is not known.

Upon completion of the inspection, the HELLESPONT PRIDE commenced discharging her cargo. Within a few hours after the discharge was completed, Saybolt and Caleb Brett took ullages of the shore tanks and gauged the free water, finding 13,215.9 barrels of free water—an increase of 3,879.8 barrels above the quantity of free water found on the HELLESPONT PRIDE upon arrival. Such an increase in free water between the ship and shore tank was out of the ordinary and Caleb Brett requested that the shore tanks be regauged for free water the next morning. Regauging produced no change in measurement.

On March 5, Saybolt telexed Derby and reported in part that "S/T RECD ... BBLS. 408,088.79 API 35.3." On the basis of the quantity reported in this telex, Derby invoiced Cities in the amount of $539,111.69 to cover the exchange imbalance in the excess delivered quantity of Forcados crude oil over Amna crude oil. Cities paid the Derby invoice.

On March 12, Saybolt sent the following telex to Derby:

RE HELLESPONT PRIDE AT MANTUA TERM

DOCK 1005 2/28 START 1815 FINISH 1430 3/3

S/T GALS 16848354 BBLS 401151.28

L/T 53132.49 LBS 119016773

API 35.3

VESSEL ROB'S 1892.90

ABOVE CORRECTED FIGURES DUE TO DEDUCTION OF 6937.51 (1.7 PERCNT) OF WATER AND SEDIMENT

The figures reported in this telex were subsequently incorporated into Saybolt's final survey report. On the basis of the revised quantity reported in Saybolt's March 12 telex, Derby invoiced Cities for an additional $272,056.64. This invoice also was paid by Cities.

Caleb Brett analyzed its composite sample in its laboratory. The tests showed an S & W content of 0.2% and gravity of 35.6. Saybolt had reported the S & W content of the cargo to be 1.7%. On March 26, Caleb Brett obtained a one gallon composite sample from Seaview. The source of this sample, however, is not established, and it could have come from a number of sources other than the Saybolt composite sample. These tests showed a trace S & W content and gravity of 35.8.

Caleb Brett and Saybolt next cross-tested each other's composite samples. On March 27, Saybolt brought a one quart sample to the Caleb Brett laboratory and witnessed the testing of the sample by Caleb Brett. The tests showed an S & W content of 1.8% and gravity of 31.6. On March 30, Caleb Brett witnessed Saybolt test the same Saybolt sample supplied on March 27. The tests showed an S & W content of 1.9% and gravity of 31.5.

Caleb Brett also supplied the Caleb Brett composite sample to Saybolt for testing. The tests showed an S & W content of 0.05% and gravity of 35.6. In its official survey report, Saybolt reported a gravity of 35.3. In analysing the Saybolt composite sample, however, the Saybolt laboratory actually found the gravity of the composite sample to be 31.5.

*The Saybolt Sampling and Testing Methods*

A. *The ASTM/API Standard*

The American Petroleum Institute has a membership comprised of most of the companies engaged in the petroleum industry, including production, refining, and transportation. The American Petroleum Institute publishes standards and procedures for the sampling of petroleum and petroleum products. The American Petroleum Institute, in conjunction with the American Society for Testing and Materials, approved and adopted "Standard Method of

Sampling Petroleum and Petroleum Products" ("ASTM/API Standard Method"), which was in effect in February and March 1981 and is referenced in the contract as an appropriate standard for use in testing the crude oil.

The ASTM/API Standard Method is the uniformly accepted standard in the petroleum industry for taking samples of oil cargoes. The ASTM/API Standard Method represents the unanimous consensus of the petroleum industry on how the sampling of cargoes should be done. All independent inspection companies, including Saybolt, instruct their inspectors to follow the ASTM/API Standard Method in taking samples. Captain Chris Kakoulas, Derby's expert witness, personally instructed Saybolt's inspectors to follow the ASTM/API Standard Method.

### B. *Taking the Saybolt Composite Sample*

In taking an "all-levels sample", the ASTM/API Standard Method provides that the stoppered container is to be lowered or submerged "to a point as near as possible to the draw-off level," i.e., above the level of the free water in the tank. This is to avoid the risk of introducing free water into the sample and contaminating it.

Saybolt failed to follow this procedure. In each of the twelve tanks sampled, Saybolt (1) lowered the stoppered or corked sample bottle to the bottom of the tank, (2) raised it through the free water zone to a level above that zone, (3) pulled the stopper or cork out of the bottle, and (4) sampled by raising the bottle to the top of the tank. Saybolt also improperly attached its sample container to its measuring tape, rather than to the cord or chain prescribed by the ASTM/API Standard Method. As a result, Saybolt increased the chances of getting additional free water in its sample, thereby making it unrepresentative and inappropriate for testing.

### C. *The Content of the Saybolt Composite Sample*

The ASTM/API Standard Method prohibits the mixing of slop tank samples with cargo samples. Saybolt violated the ASTM/API Standard Method by mixing the slop tank samples—which had a higher suspended water content—with the cargo samples. As a result, the testing was not conducted in compliance with the terms of the contract. Evidence at trial indicated that the result of Saybolt's error would "grossly exaggerate" the S & W content of the cargo. The presence of a substantial amount of suspended water in the oil would also have the effect of lowering the gravity of the oil, making it unrepresentative and inappropriate for analysis.

### D. *Dividing Up the Saybolt Composite Sample*

The ASTM/API Standard Method provides that the composite sample being prepared for testing and analysis should not be divided up by the inspector before being brought to the laboratory and subjected to mechanical mixing. Mechanical mixing is necessary to assure an even and homogeneous distribution of the material throughout the sample.

Testimony at trial indicated that, particularly in the case of light crude oils which have a limited ability to retain water in suspension, the water falling out of suspension collects at the bottom of the sample container and, if the sample is divided without mechanical mixing, the water will all be contained in the bottom of the retained portion of the sample. As a result, the S & W content of the sample will be distorted.

Saybolt divided up its sample on board the HELLESPONT PRIDE after shaking the sample container by hand. Saybolt did not comply with the ASTM/API Standard Method. As a result, the representative nature of the remaining portion of the sample was likely destroyed, making it inappropriate for analysis and testing.

### E. *Saybolt's Reporting of the Results of the Gravity Tests and the Quantity of Crude Oil Delivered*

The Seaview Refinery was specially designed and built for the processing of

Amna crude oil. The delivered crude oil was Amna crude oil, and Seaview has never claimed otherwise.

Amna crude oil is classified as a "light" crude oil. It has a gravity of between 35 and 36. Saybolt's March 5 and 12 telexes to Seaview reported the gravity of the oil to be 35.3. Yet, the Caleb Brett and Saybolt cross-tests of the Saybolt composite sample conducted on March 27–30, 1981, yielded gravities of only 31.6 and 31.5, respectively. Therefore, Saybolt's reported gravity was inconsistent with its own test results. While the low gravity and correspondingly high S & W content of the Saybolt composite sample may be explained by Saybolt's sampling irregularities, there is no explanation in the record for Saybolt's reporting of the higher—and more representative—gravities in its telexes to Seaview. Only the cross-tested Caleb Brett composite sample yielded representative gravities consistent with Amna crude oil—35.6 when tested by each firm.

Furthermore, the testimony at trial demonstrated that an inspection company would not report the net outturn quantity of oil without first knowing and reporting the S & W content because the net outturn quantity cannot be determined without subtracting the S & W content. As a result, Saybolt's March 5 telex, which did not report an S & W content, would, according to industry custom and practice, imply that the crude oil delivered had a negligible S & W content. The basis of Saybolt's revised March 12 telex, which reduced the net outturn quantity and reported an S & W content of 1.7% also was not explained at trial.

### F. Seaview's Use of a Deemulsifier

The Saybolt inspector, Joseph William Schriver ("Schriver"), testified at his deposition—which testimony was introduced at trial—that he was aware that Seaview was adding a deemulsifier (a chemical agent which causes water in suspension to precipitate out of oil) to the cargo during cargo transfer to the shore tanks, that it was typical for Seaview to do so, but that he did not consider it his responsibility to advise Derby or Cities of Seaview's use of a deemulsifier.

Both Cities' and Derby's witnesses testified that injecting a deemulsifier into a cargo during the discharging operation was unheard of in the petroleum industry. As a result, Saybolt, by using its composite sample, deducted the same amount of water twice in arriving at the net quantity of Amna crude oil delivered—first as the increase in free water found in the shore tanks after the cargo had been discharged and then as the S & W content of the cargo determined from the composite sample taken prior to the addition of the deemulsifier.

### G. The Disputed Calculations

Cities and Derby agree as to the deduction of approximately 9,336 barrels of free water found on the HELLESPONT PRIDE at her arrival in New Jersey. Cities disputes the validity of Saybolt's deduction of an additional 3,880 barrels of free water found in the Seaview shore tanks after the discharge of the cargo because of the use of the deemulsifier, which is not standard industry practice. Cities also disputes Saybolt's deduction of approximately 6,938 barrels for S & W because of Saybolt's improper sampling techniques which resulted in a sample with an uncharacteristically high S & W content. As a result, Cities asserts that the Caleb Brett samples, which were taken in accordance with industry standards, and the Caleb Brett analysis that 410,625 barrels of crude oil were delivered to Derby and Seaview is accurate and should be the amount upon which payment is determined.

### CONCLUSIONS OF LAW

The issue of law presented by this case is whether the Saybolt certification of the quantity and quality of the crude oil delivered to Seaview by Cities as part of its contract with Derby is "conclusive and binding" on Cities and Derby, as is provided by the terms of their contract.

Cities contends that, where a contract sets forth standards or procedures to be followed by an independent third party to

whom a determination or certification of quantity, quality or value is entrusted, (1) the failure of such independent third party to follow the prescribed standards or procedures will invalidate any certification or determination so made even if the contract makes such certification or determination conclusive and binding on the parties; and (2) even in the absence of a contractual provision specifying methods, standards or procedures, such a determination or certification will not be conclusive and binding where, as is the case here, there exists either fraud, bad baith or gross error. Cities further contends that fraud, bad faith or gross error may be inferred, as is the case here, if (a) customary practices or procedures are disregarded; (b) the results deviate significantly from the normal or reasonable range of results; or (c) other inspections or appraisals yield results which conflict significantly with the official inspection where, in addition, there is evidence to indicate the unreliability or inaccuracy of the official inspection or appraisal.

Derby, on the other hand, argues (1) that the report of an independent inspector, which is agreed upon by the parties to be final, is conclusive and binding on the parties absent a showing of fraud, bad faith or a gross mistake that is tantamount to fraud, and (2) that Cities has not met its burden in establishing the fraudulent conduct necessary for the Court to overturn the conclusive and binding nature of Saybolt's findings.

Section 9.4 of the Cities/Derby contract provides that "[t]his Agreement shall be construed and governed by the laws of the State of New York...." It should initially be noted, however, that defendant's observation that the issue of the conclusive and binding nature of an independent inspector's report or certification has not been litigated with any frequency in any of the courts in New York State appears correct.

■ In general, the determination or certification of an independent inspector is conclusive and binding on the parties in the absence of fraud, bad faith or gross error. *See, e.g., Amoco Oil Company v. H. Gru-*

*newald & Company,* 592 F.2d 745 (4th Cir.1979) (a case involving the same independent inspector as this case and construing New York law); *Van Iderstine Co., Inc. v. Barnet Leather Co., Inc.,* 242 N.Y. 425, 152 N.E. 250 (1926); *Savin Brothers, Inc. v. State of New York,* 62 A.D.2d 511, 405 N.Y.S.2d 516 (4th Dep't 1978), *aff'd,* 47 N.Y.2d 934, 393 N.E.2d 1041, 419 N.Y.S.2d 969 (1979) ("However, if there appears no reasonable basis for the engineer's action, if it is patently erroneous, then the courts have found the equivalent of bad faith and the contractor is not bound by the engineer's decision."); *Bullard v. Morgan H. Grace Co., Inc.,* 210 A.D. 476, 206 N.Y.S. 335 (1st Dep't 1924) ("... it seems quite apparent that under the contract in question the dispute between the parties arising out of the contract cannot be concerned with any question of the quality of the commodity in view of the inspection certificates of the Argentine government which were contracted to be final as to quality, weight, and grade."); *Clinton v. Brown,* 41 Barb. 226 (N.Y.Sup.Ct.1863) (where, on appeal, the court held, in construing a written contract for the sale of hops, which called for independent inspection, that such inspection was conclusive and that a showing by the buyer that his own inspection revealed the hops to be of inferior quality than that contracted for was not permitted). *Accord American Pipe & Construction Co. v. Westchester County,* 292 F. 941, 948 (2d Cir.1923) ("The rule for the federal courts is announced in *Kihlberg v. United States,* 97 U.S. (7 Otto) 398, 24 L.Ed. 1106, and is that, where a decision is made by an arbiter provided by the contract, and where the contract provides that his decision shall be final, his action, in the absence of fraud or gross mistake as would necessarily imply bad faith or failure to exercise an honest judgment, is conclusive upon the parties. This rule has been consistently adhered to in the federal courts." (citations omitted)).

In New York, fraud, bad faith or gross error on the part of the independent inspector has been inferred (1) where customary

practice or procedure is not followed when making the determination or certification, *see Plata American Trading, Inc. v. Kenneth Lancashire*, 29 Misc.2d 246, 214 N.Y. S.2d 43 (Sup.Ct.N.Y.Co.1957), *aff'd*, 6 A.D.2d 1036, 178 N.Y.S.2d 1021 (1st Dep't 1958) (where a certificate of quantity of tallow loaded on board a vessel was set aside because the inspector merely took ullages when sound practice in the industry required the inspector to use a calibration chart as well), and (2) where the results of the determination or certification deviate significantly from the normal or reasonably expected results, *see Amoco Oil Company v. H. Grunewald & Co.*, 592 F.2d at 748 n. 7 (citing *Korein v. Rabin*, 29 A.D.2d 351, 357, 287 N.Y.S.2d 975, 980 (1st Dep't 1968).

Other jurisdictions also have inferred fraud, bad faith or gross error on the part of the independent inspector where other inspections or appraisals yielded results which conflicted significantly with the official inspection or appraisal and where, in addition, there was evidence to indicate the unreliability or inaccuracy of the official inspection or appraisal. *See Herman H. Hettler Lumber Co. v. Olds*, 221 F. 612 (6th Cir.1915) (where the court refused to grant a motion for summary judgment to a party averring the conclusiveness of an inspection certificate because the results of two subsequent quality inspections of a load of lumber differed materially from the results of the official inspection and because evidence of the conditions under which the official inspection was made called into question the reliability or accuracy of the findings of the official inspection).

■ Nonetheless, where a contract sets forth the standards or procedures to be followed by an independent third party to whom the determination of quantity, quality or value is entrusted, the failure of such independent third party to follow the standards or procedures prescribed in the contract will invalidate any certification or determination so made even if the contract makes such certification or determination conclusive and binding. *See Mange v. Uni-*

*corn Press, Inc.*, 129 F.Supp. 727 (S.D.N.Y. 1955) (where the court denied summary judgment in a case which involved a word contest whose "Official Rules" provided that the *New Funk & Wagnalls Encyclopedia* would be "the final and deciding authority" as to the correctness of all answers and also provided that "the decision of the Publishers shall be final and conclusive in all matters concerning the conduct of the contest, the judging of answers and solutions to Puzzle Quizzes" and where a contestant challenged his disqualification on the grounds that his answer was correct according to the official encyclopedia). *Accord M. De Matteo Construction Co. v. Maine Turnpike Authority*, 184 F.Supp. 907, 915 (D.Me.1960) ("But if the Engineer exceeded the powers given it in the Contract or disregarded the ground rules specified in the Contract, its decision was not final and could not be binding upon the parties in this action.").

■ On the basis of these principles, the Court concludes that the plaintiff in this action has met its burden of proving that the Saybolt inspection and determinations as to quantity and quality should be set aside.

### Use of Improper Sampling Techniques

The Cities-Derby contract provides both that all determinations as to quantity and quality made by the independent inspector shall be conclusive and binding on both parties and that all tests shall be made in accordance with standard test methods generally accepted in the petroleum industry. Defendant focuses on that contract provision which makes all determinations conclusive and binding and would have the Court ignore that provision which specifies test methods. Defendant's focus is incorrect, and, as a result, most of the cases relied on by defendant are inapposite because the contracts in those cases did not contain similar contract provisions.

Under New York law, all parts of an agreement are to be reconciled, if possible, in order to avoid inconsistency. *National Conversion Corp. v. Cedar Building*

*Corp.,* 23 N.Y.2d 621, 246 N.E.2d 351, 298 N.Y.S.2d 499 (1969). And, where two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so. *Proyecfin de Venezuela, S.A. v. Banco Industrial de Venezuela, S.A.,* 760 F.2d 390 (2d Cir.1985).

The two contract provisions reasonably can be reconciled, and, as a result, this Court is required to do so. The construction of these provisions which gives appropriate weight to both provisions is that the tests conducted by the independent inspector must be made in accordance with standard test methods generally accepted in the petroleum industry and, when so made, the results are conclusive and binding on both parties. The universally accepted test method is the ASTM/API standard method; the Saybolt inspector was instructed to use this method, and he failed to do so when he (1) took the sample after passing the sample container through the free water zone, (2) mixed the slop tank samples with the cargo samples, and (3) divided up the composite sample in the field without mechanical mixing.

As a result, this case falls within the rule enunciated in *Mange v. Unicorn Press.* Where the Saybolt inspector "attempted to make a decision outside his sphere of competence" by using unauthorized test methods, "the rule that the decisions of an arbiter chosen by the contracting parties are binding in the absence of fraud does not seem to have application." *Id.,* 129 F.Supp. at 729. And, where the independent inspector does not exercise his powers according to the rules set forth in the contract, "his decision is binding on no one." *M. De Matteo Construction Co. v. Maine Turnpike Authority,* 184 F.Supp. at 914.

It would be patently unfair to the plaintiff here who contracted to have certain tests performed in a specific manner to hold him bound by those test results when they did not conform to the terms of the contract. Accordingly, Saybolt's deduction of approximately 6,938 barrels for S & W is set aside because Saybolt used improper sampling techniques.

*Use of the Deemulsifier*

The Saybolt inspector knew that Seaview was injecting a deemulsifier into the cargo as it was being unloaded into the shore tanks,[2] but did not consider it his responsibility to so advise Derby or Cities even though uncontradicted testimony indicated that such practice was unheard of in the petroleum industry. By not taking into consideration Seaview's use of the deemulsifier, the Saybolt inspector knowingly deducted 3,880 barrels of water twice in arriving at the net quantity of Amna crude oil delivered. First, the water was deducted as the increase in free water found in the shore tanks after the cargo had been discharged and the deemulsifier injected. Second, the water was again deducted as the S & W content of the cargo as determined from the composite sample which was taken prior to discharge and prior to the injection of the deemulsifier.

The Court finds this conduct on the part of the Saybolt independent inspector, as well as the deviation from standard sampling techniques, to be tantamount to the fraud, bad faith or gross error necessary to overturn the certification of an independent inspector. The customary practice of not using a deemulsifier was ignored by the independent inspector in his calculations and the results of the tests were inconsistent with a finding that the cargo was Amna crude oil. Both reasons are grounds for inferring fraud, bad faith or gross error in New York pursuant to the *Plata Ameri-*

---

**2.** Both Cities and Derby offered the deposition testimony of Joseph William Schriver, the Saybolt independent inspector, in its entirety. Schriver testified that he was aware that Seaview was using a deemulsifier on the cargo. In their Joint Pre-Trial Order, the parties question whether trial witnesses Donald Bruce of Cities and Michael Reid of Caleb Brett may testify at trial that Seaview had admitted, through statements made by its vice president, that Seaview added a deemulsifier during discharge. The Court does not reach this evidentiary issue because it relies on the Schriver deposition testimony, which was jointly offered by the parties, in determining that Seaview used a deemulsifier on the HELLESPONT PRIDE's cargo.

can *Trading, Inc.* and *Amoco Oil Company* cases.

Defendant argues that the court in the *Amoco Oil Company* case stated that an error of approximately 1.7% of the total cargo of 221,072 barrels of crude oil was not of such a magnitude as to justify an inference of bad faith or as to represent such gross error that the conclusiveness of the determinations should be ignored. *Id.*, 592 F.2d at 748 n. 7. Defendant analogizes that here the total amount in dispute represents approximately 2.4% of the total cargo and it likewise is not of such a magnitude as to justify an inference of fraud, bad faith or gross error. However, defendant's argument ignores that in the *Amoco* case the damages sought totalled $42,181.80, while here damages of $374,225.26 are sought. The magnitude of the loss here clearly is much greater than in *Amoco*. As a result, this Court finds it sufficient to justify such an inference of fraud, bad faith or gross error.

Accordingly, Saybolt's deduction of approximately 3,880 barrels of free water after use of the deemulsifier, as well as 6,938 barrels for S & W as a result of improper sampling techniques, are set aside because the errors involved are of such a magnitude as to justify an inference of fraud, bad faith or gross error.

The Court further concludes that Cities' use of the Caleb Brett calculations to quantify the discrepancy and to arrive at the amount of damages was appropriate under the circumstances because the Caleb Brett measurements were taken in accordance with the ASTM/API standard method and yielded results consistent with the characteristics of Amna crude oil.

*Prejudgment Interest*

Under New York law, Cities is entitled to prejudgment interest by reason of Derby's breach of contract. N.Y.Civ. Prac.L. § 5001(a); *Adams v. Lindblad Travel, Inc.*, 730 F.2d 89, 93 (2d Cir.1984). Prejudgment interest is awarded at the statutory rate and should accrue from April 1, 1981, the approximate date on which Cities overpaid Derby by $374,225.26 under the terms of the Cities-Derby contract.

Effective June 25, 1981, the statutory rate of interest under CPLR 5004 was increased from 6% to 9%. However, the 9% rate was not retroactive, and interest prior to June 25, 1981 is calculated at 6%. *Public Service Co. of Colorado v. Chase Manhattan Bank*, 577 F.Supp. 92 (S.D.N.Y. 1983). Accordingly, prejudgment interest is awarded in the amount of 6% per annum for the period from April 1, 1981 through June 25, 1981 and in the amount of 9% per annum thereafter.

### CONCLUSION

The certification of the Saybolt independent inspection is overturned. Cities is awarded $374,225.26 on its breach of contract claim. Judgment is to be entered in favor of Cities and against Derby in accordance with the foregoing.

SO ORDERED.