**In re CRYSEN/MONTENAY ENERGY COMPANY, Debtor,**

**CRYSEN/MONTENAY ENERGY COMPANY, Debtor– Appellant,**

**v.**

**CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Appellee.**

**No. 92 Civ. 883 (KTD).**

United States District Court, S.D. New York.

July 28, 1993.

Becker, Glynn, Melamed & Muffly, New York City for debtor-appellant; Joseph D. Becker, Richard N. Chassin, of counsel.

Charles E. McTiernan, Jr., New York City, for appellee; Lawrence S. Menkes, of counsel.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge.

Debtor–Appellant, Crysen/Montenay Energy Company ("Crysen") appeals, pursuant to 28 U.S.C. § 158(a), from a final order of the Bankruptcy Court (Blackshear, J.) denying its motion for summary judgment and granting the cross-motion for summary judgment of Appellee, Consolidated Edison Company of New York, Inc. ("Con Edison"). By Memorandum Decision dated

September 24, 1991 (the "Bankruptcy Court Decision"), the bankruptcy court held that: (1) pursuant to a contract entered into between Con Edison and Crysen, Con Edison had the right to accept a portion of the cargo and reject the rest; and (2) the amount of oil received by Con Edison was to be determined by the independent inspector's shore tank measurements at the Con Edison facility.

## BACKGROUND

On November 1, 1985 Crysen and Con Edison entered into an agreement (the "Agreement") whereby Crysen agreed to sell Con Edison approximately 4.4 million barrels of oil, with delivery to occur in installments, through March 31, 1987. The Agreement required any oil delivered to meet a minimum temperature of 135° F. Further, it was agreed that Con Edison's static shore tanks [1] would provide the appropriate basis for determining the quantity of oil delivered. In the event, however, that static shore tanks were unavailable, the proper measure of oil delivered would be the amount of oil discharged by the tanker. To ascertain the quality and the quantity of the oil delivered, the Agreement provided for the use of an independent petroleum inspector (the "Inspector").

On January 22, 1986 the ship Mara arrived at Con Edison's shore tanks, whereupon, the Inspector determined that it contained approximately 190,159 barrels of oil, with an average temperature of 114.3° F. In addition, the Inspector found Con Edison's shore tanks to be static. Although the oil was below the contracted temperature, Con Edison permitted delivery to commence. The low temperature of the oil, however, caused increased viscosity resulting in considerably slow delivery efforts.

After 31½ hours of discharging, Con Edison ordered the tanker to cease delivery. The Inspector determined that while 110,-201.56 barrels of oil were discharged from the Mara, Con Edison's shore tanks had received only 99,719.02 barrels. Despite an investigation into the matter, the fate of the missing 10,483 barrels remains a mystery. Con Edison paid for the 99,719.02 barrels of oil delivered to its shore tanks, less the contractually provided low temperature price reduction. Thereafter, Crysen sold the remaining oil to another customer at a loss.

On June 27, 1986, Crysen filed a petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code. On January 5, 1988, Crysen commenced an adversary proceeding against Con Edison for breach of contract. The bankruptcy court granted summary judgment in favor of Con Edison, and this appeal followed.

## DISCUSSION

This appeal presents the issues of whether: (1) application of the contractually provided low temperature price adjustment was the exclusive remedy under the Agreement for delivery of "cold" oil; (2) ¶ 3(b)(ii) of the contract is ambiguous; (3) the commercial unit applicable to this contract was the cargo lot or the barrel; and (4) the amount of oil delivered equaled the amount received at the static shore tanks, as determined by the Inspector, or the amount actually discharged from the tanker.

■ As a preliminary matter, it should be noted that the law in this circuit requires a district court reviewing a bankruptcy court's grant of summary judgment to apply the same standard of review that the Court of Appeals would apply when reviewing such determinations from a district court. *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 988 (2d Cir.1990). Accordingly, the bankruptcy court's conclusions of law are reviewed de novo, and its findings of fact are reviewed under a clearly erroneous standard. *Id.*

■ Crysen's primary contention on appeal centers on the proper application of ¶ 3(b)(ii) of the Agreement. Paragraph 3(b)(ii) provides that the:

Buyer shall have the right to refuse delivery of, or to reject following delivery, any oil which fails to conform to the aforesaid specifications. If the Buyer

---

**1.** A static shore tank is one into or out of which nothing but the oil being delivered flows.

consents in writing to accept any such non-conforming oil, the price therefor shall be equitably adjusted as agreed between Buyer and Seller. In the case of a delivery which fails to meet the delivery temperature requirement, Seller shall reimburse Buyer's cost of raising the temperature to the minimum required.

Crysen argues that the bankruptcy court erred in determining that "the price reduction formula in ¶ 3(b)(ii) of the contract is the specific method by which the parties would equitably adjust the price in the event the oil did not meet the required contract temperature *and* Con Edison had elected, in writing, to accept the non-conforming oil." Bankruptcy Court Decision at 5–6 (emphasis in original). Crysen, to the contrary, advances the argument that the last sentence of ¶ 3(b)(ii) "removes the non-conformity of low temperature from the generality of the first sentence." Crysen's brief at 10. Thus, according to Crysen, the specificity of ¶ 3(b)(ii)'s final sentence requires Con Edison to accept all oil tendered, notwithstanding its temperature, if it conforms to the Agreement in all other respects. In such a situation, Crysen contends, the low temperature price adjustment provides Con Edison with its sole remedy.

■ This argument, however, must fail. Crysen's reading of ¶ 3(b)(ii) disregards § 2–719(1)(b) of the New York Uniform Commercial Code ("NYUCC"). Section 2–719(1)(b) provides that "resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy." The official comment to the NYUCC further clarifies § 2–719(1)(b) by explaining that it was intended to create "a presumption that clauses prescribing remedies are cumulative rather than exclusive. If the parties intend the term to describe the sole remedy under the contract, this must be *clearly expressed*." N.Y.U.C.C.Law § 2–719 (official comment) (McKinney 1993) (emphasis added).

Although Crysen maintains that the final sentence of ¶ 3(b)(ii) provides Con Edison with the exclusive remedy of price adjust-

ment, nowhere in the section is its exclusivity clearly indicated. Therefore, as ¶ 3(b)(ii) did not "clearly express" an intention that the low temperature price adjustment be exclusive, Con Edison maintained the remedy of rejection pursuant to NYUCC § 2–719(1)(b).

Crysen, however, takes the unsubstantiated position that § 2–719 is inapplicable to the instant case. Specifically, Crysen asserts that the section is intended to preserve remedies given by Article 2 of the Code, rather than to "choose between competing sentences of the contract itself." Crysen's Brief at 13. This argument, however, is balanced on the contention that ¶ 3(b)(ii) is ambiguous. As discussed below, such a contention is tenuous at best. Accordingly, Crysen has failed to overcome the presumption of cumulativeness contained in NYUCC § 2–719(1)(b). *See McKenzie v. Alla–Ohio Coals, Inc.*, 29 U.C.C.Rep.Serv. 852, 856, 1979 WL 30087 (D.D.C.1979) ("[i]n the absence of an express indication in the writings of the parties, or a course of conduct clearly establishing [the] use of only one kind of remedy, the court cannot conclude that the presumption that remedies be cumulative is overcome").

Nevertheless, even assuming *arguendo* that the final sentence of 3(b)(ii) satisfied NYUCC § 2–719(1)(b), Crysen's argument still fails, as its construction of the sentence is overbroad. The price adjustment specified in the contested final sentence of ¶ 3(b)(ii) is intended to provide for the limited eventuality that the sole non-conformity is low temperature and Con Edison has agreed in writing to accept delivery. The final sentence does not, however, by any stretched interpretation, mandate the acceptance by Con Edison of all oil tendered where the only deficiency relates to temperature. Rather, it acts to provide the price adjustment once acceptance has occurred. Thus, assuming exclusivity, Con Edison's sole remedy for the quantity of "cold" oil *accepted* prior its demanding the Mara to cease discharge would be the price adjustment, whereas it maintained the gen-

eral right to reject the unaccepted, nonconforming oil.

Attacking the clause on another level, Crysen submits that the ambiguity of ¶ 3(b)(ii) precludes summary judgment. It is true, as Crysen asserts, that an action concerning a contract dispute may only be adjudicated by summary judgment when the contract is "wholly unambiguous." *Wards Co. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 120 (2d Cir.1985) (quoting *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975)). It is also true, however, that a purely facial claim of ambiguity will not preclude summary judgment. *Mycak v. Honeywell, Inc.*, 953 F.2d 798, 802 (2d Cir.1992).

To defeat a motion for summary judgment on the grounds of ambiguity, the nonmoving party must demonstrate that the contract is "susceptible of at least two fairly reasonable meanings," thereby presenting material issues of fact necessitating a trial. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir.1983). As noted above, however, there is only one practical interpretation of the clause in question. Crysen's argument to the contrary is unreasonable.

Crysen next argues that even assuming the price reduction remedy of ¶ 3(b)(ii) was cumulative rather than exclusive, Con Edison was still barred from accepting half of the Mara's cargo and rejecting the remainder. To this end, Crysen seeks shelter under NYUCC §§ 2–601(c) and 2–606(2). Section 2–601(c) provides that a buyer faced with a nonconforming delivery may "accept any commercial unit or units and reject the rest." N.Y.U.C.C.Law § 2–601(c) (McKinney 1993). Section 2–606(2), states that the "[a]cceptance of a part of any commercial unit is the acceptance of that entire unit."

N.Y.U.C.C.Law § 2–606(2) (McKinney 1993). Accordingly, Crysen contends that the commercial unit applicable to the Agreement was the cargo lot, and, therefore, Con Edison's partial acceptance of the oil violated § 2–606(2).

NYUCC § 2–105(6) defines commercial unit as:

such a unit of goods as by commercial usage is a single whole for purposes of sale and division of which materially impairs its character or value on the market or in use. A commercial unit may be a single article (as a machine) or a set of articles (as a suite of furniture or an assortment of sizes) or a quantity (as a bale, gross, or carload) or any other unit treated in use or in the relevant market as a single whole.

N.Y.U.C.C.Law § 2–105(6) (McKinney 1993). A determination as to what constitutes a commercial unit for the purposes of the Agreement necessarily entails reference to the Agreement itself and the prior course of dealings between the parties. Furthermore, the official comment to NYUCC § 2–601 explains that "the test is not only what unit has been the basis of [the] contract, but whether the partial acceptance produces so materially adverse an effect on the remainder as to constitute bad faith." N.Y.U.C.C.Law § 2–601, Official Comment 1 (McKinney 1993).[2]

The bankruptcy court properly determined that the basis of the contract, and therefore the applicable commercial unit, was the barrel, and not the cargo load. The Agreement expressly provided that both the price and quantity of oil to be delivered would be figured in terms of barrels. Additionally, the prior dealings between both parties indicate that on several occasions, less than an entire cargo load had been delivered by Crysen and accepted by Con Edison, with the balance sent else-

---

**2.** Crysen did not raise the issue of good faith in its pleadings or motion papers. Thus, as the bankruptcy court did not have the opportunity to make factual findings or hear evidence on the issue, Crysen is precluded from raising it for the first time on appeal. *Schwimmer v. Sony Corp. of America*, 637 F.2d 41, 49 (2d Cir.1980). Nevertheless, Crysen's assertion has no merit. If,

as Crysen contends, Con Edison rejected the balance of the Mara's shipment because of declining oil prices, it is reasonable to conclude that Con Edison would have preferred to reject the entire shipment, which it was legally entitled to do. Thus, contrary to Crysen's claim, it seems clear that Con Edison acted in good faith under the circumstances.

where. In those instances, the shipment prices were determined at a per barrel rate.

Although Crysen suffered a loss on the resale of the balance of the cargo, Crysen adduced no evidence that Con Edison's partial acceptance materially impaired the remainder's character or value on the market or in use. *See Askco Engineering Corp. v. Mobil Chemical Corp.*, 535 S.W.2d 893 (Tex.Civ.App.1976) (evidence failed to establish that division of delivery materially impaired remainder). Unfortunately for Crysen, dropping oil prices occasioned the losses, not Con Edison's division of the cargo. Thus, because the commercial unit was the barrel, and not the cargo load, Con Edison did not breach the Agreement by accepting only part of the cargo.

Finally, Crysen claims that Con Edison is responsible for the 10,483 missing barrels of oil. Pursuant to ¶ 11(a) of the Agreement, both the quantity and quality of oil delivered were to be ascertained by the Inspector's certification. If static shore tanks were available, ¶ 11(b) provided that the Inspector's measurements of those tanks would determine the proper quantity delivered. In the event such tanks were unavailable, vessel discharge figures were to be used.

 Crysen charges that the shore tanks were not, in fact, static, and that therefore the ship discharge measurements are the appropriate indicator. In support of this argument, Crysen points to a statement of the Inspector advising the parties to utilize the vessel measurements. As the bankruptcy court correctly stated, when a contract stipulates that an independent inspector is to certify the quantity received, absent a showing of fraud, bad faith, or gross error, the inspector's certification is binding upon the parties. *Cities Service Co. v. Derby & Co.*, 654 F.Supp. 492, 500 (S.D.N.Y.1987). *See Amoco Oil Co. v. H. Grunewald & Co.*, 592 F.2d 745, 748 (4th Cir.1979). An independent inspector, however, has no power to bind the parties beyond the scope of his authority.

 Prior to delivery, the Inspector determined that the receiving tanks were static. Thereafter, although the Inspector could not account for the missing oil, it never indicated that the tanks were not actually static. Thus, as the Agreement mandates the use of shore tank measurements once the Inspector determined that they were static, the amount received therein controlled, notwithstanding a recommendation by the Inspector that the most representative figure of oil received was the ship discharge measurement.

Crysen further claims that the shore tanks could not have been static because other tanks on the same line remained active. This, as the bankruptcy court noted, has no basis in either fact or logic as Con Edison could not possibly shut down all systems each time they received an oil delivery.

Crysen also points to the statements of John O'Connor, an investigator hired to determine the whereabouts of the missing oil, which speculate that the missing oil was lost at the Con Edison facility. Mr. O'Connor, however, who was not present during the disputed incident, relied on the Inspector's report for his conclusions. As noted, this report does not question the Inspector's initial finding that the tanks were static. Accordingly, Mr. O'Connor's statement provides little support for Crysen's position. Furthermore, it is not within Mr. O'Connor's province to alter either the terms of the Agreement or the findings of the Inspector.

In light of the foregoing, the evidence proffered by Crysen is insufficient for a reasonable jury to conclude that Con Edison's shore tanks were not static. Thus, the bankruptcy court properly determined that the parties are bound by the Inspectors certification that 99,719.02 barrels were received by the static shore tanks. As such, Con Edison can not be held to account for the missing barrels of oil.

In conclusion, Con Edison had the right, as a matter of law, to accept a portion of the shipment, while retaining the right to reject the balance. Additionally, in accordance with the contract, Con Edison was only required to pay for the barrels re-

928

ceived by its static shore tanks, as certified by the independent inspector.

For the foregoing reasons, the Memorandum Decision of the Bankruptcy Court is, in all respects, affirmed.

SO ORDERED.