**George CONDAKES et al., Plaintiffs,**
**v.**
**SOUTHERN PACIFIC COMPANY,**
**Defendant.**

Civ. A. No. 67-892-G.

United States District Court
D. Massachusetts.

Aug. 19, 1969.

Frank Infelise, Lynn, Mass., for plaintiffs.

George B. Redding, Boston, Mass., for defendant.

## MEMORANDUM OF DECISION

GARRITY, District Judge.

This suit is brought under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C.A. § 20(11), to recover for loss allegedly suffered as a result of damage to a carload of Redhaven peaches during shipment from Sanger, California, to Boston, Massachusetts. Since the conclusion of the trial without jury, the court has received requests for findings of fact and conclusions of laws, oral argument and supplementary briefs.

### Findings of Fact

1. The plaintiff, George Condakes, does business as a wholesale distributor of fresh produce at Boston, Massachusetts, under the name Peter Condakes Company. The defendant is a railroad corporation engaged in interstate commerce.

2. On June 27, 1964, one refrigerator car, number BAR 7288, pre-iced and containing 1170 lidded 5¾" lugs or boxes of Redhaven peaches, was received

for shipment under a uniform straight bill of lading by defendant at Sanger, California. Before delivery to defendant the car had been loaded for shipment and braced in the generally accepted manner.

3. At the time the car was delivered to defendant it and its contents were inspected by a state inspector licensed by the United States Department of Agriculture. The inspection certificate states that the peaches were "U. S. Extra No. 1" and "Mostly hard, some firm. Most show ½ or more red blush. Defects within tolerance. Meets Canadian import requirements." The inspection certificate [1] contains no other information relevant to the condition of the carload and its contents.

4. The car was thereafter transported by rail from Sanger, California, and arrived at Boston, Massachusetts, on July 6, 1964. The car was regularly and properly iced during transit in accordance with the shipping instructions.

5. The requirements of various grades of peaches are set forth in Title 7 of Code of Federal Regulations, those for "U. S. Extra No. 1" in § 51.1211 and for "U. S. No. 1" in § 51.1212.[2] The difference between the two grades pertains only to color, the better grade being required to have a blushed, pink or red color which develops only while the fruit is on the tree. Both grades must be free from bruises and decay, though variations from grade are tolerated, under subsection (a), as follows:

"In order to allow for variations incident to proper grading and handling, not more than 10 percent, by count, of the peaches in any lot may fail to meet the requirements of U. S. No. 1 grade, but not more than one-half of this amount, or 5 percent, shall be allowed for defects causing serious damage, and not more than one-fifth of this amount, or 1 percent, shall be allowed for decay at shipping point: Provided, That an additional tolerance of 2 percent shall be allowed for soft, overripe or decayed peaches en route or at destination."

The color requirements of U. S. Extra No. 1 are that "50 percent, by count, of the peaches in any lot shall have not less than one-fourth of the surface showing blushed, pink or red color." The provision regulating permissible variation respecting color is as follows:

"No part of any tolerance shall be used to reduce for the lot as a whole the 50 percent of peaches required to have not less than one-fourth of the surface showing blushed, pink or red color, but individual packages may contain not less than 40 percent of peaches having this amount of color: Provided, That the entire lot averages not less than 50 percent."

"Serious damage" is defined in § 51.1222 and means any injury or defect which seriously affects the appearance, or the edible or shipping quality of the peach.

6. Upon arrival in Boston, the peaches were inspected by three inspection agencies whose reports, with respect to descriptions and grading of the produce, were as follows:

(a) United States Department of Agriculture, Agricultural Marketing Service—"Products inspected: PEACHES in display lugs, cup pack, labeled, "Dan-Dee-O, Hall Packing Co., Sanger, Calif." Stamped U. S. No. 1 Red Haven" and to denote count and various lot numbers. Inspectors count 85 lugs. Quality: Mature, clean, well shaped. From 20 to 80%, mostly 25 to 60% of surface pink to red color. Grade defects average 2%. Condition: Firm to ripe mostly ripe.

1. The certificate was issued under the authority of the Agriculture Marketing Act of 1946, 7 U.S.C. § 1622(h), c. 38, which provides, "Any official certificate issued under the authority of this subsection shall be received by all officers and all courts of the United States as prima facie evidence of the truth of the statements therein contained."

2. There are other grades, "U.S. Fancy" and "U.S. No. 2." None of them pertains to the size of the peaches; size requirements are set forth in other regulations.

Ground color yellow. In most lugs 2 to 35% some none, average 9% damage including 4% serious damage by bruising, scattered throughout pack affecting ripe peaches. Bruising occurs heaviest in lugs marked 6. Less than 1% decay. Grade: Meets quality requirements but fails to grade U. S. Extra No. 1 only account of condition."

(b) National Perishable Inspection Service, Inc.—"Bruising Range 0 to 8, average 4% serious damage by bruising in good order packs. Quality, Description, Etc. Dan-Dee-O Brand. Hall Packing Co. Sanger, Calif. Red Haven variety. U. S. No. 1. Various sizes. Full cup packs. Clean. Mature. Bright appearing. Fairly well to well formed. Well brushed. Occasional full ripe, balance firm to hard ripe. 75 to 80% yellowing to yellow, balance green ground color. ⅛ to ⅔ blush color. 4 to 6% serious defects. Condition: No decay noted."

(c) Railroad Perishable Inspection Agency—"Load-Commodity-Condition: Peaches—Red Haven variety. US#1, various sizes. Full cup packs. Fairly good to good quality. Fairly well to well formed. Reasonably uniform in size. Fresh. Clean. Occasional full ripe, remainder is firm to hard ripe. 75 to 80% yellowing to yellow, remainder is light green in color. ⅛ to ⅔ blush color. 4 to 6% serious defects. Mature. No decay."

7. The condition of the load at destination was also noted by the inspectors. The government agency described it as "Stacked irregularly in car"; National Service as "Load is shifted from B to A —end of car, from 1″ to 2″ space between B-bunker wall and adjacent tier; Railroad Agency as, "An intact, divided, gate type load * * *. A good order load." Of the 1, 170 boxes or lugs in the shipment, 73 required recoopering,[3] of which 71 were made good, contents intact and undamaged.

8. "Bruising" connotes softness and a brown color of the fruit under the skin without discoloration of the skin. The more mature the peach, the more susceptible to bruising. Peaches continue to ripen after being picked; the higher the temperature, the faster they ripen. Bruising may be caused by a jar or jolt, as when a load shifts, or by relatively mature or soft peaches being packed tightly next to relatively green or hard ones, the latter type being denominated "pack bruising."

9. Plaintiff sold the peaches, as graded U. S. No. 1, in the Boston market on July 6, 1964 and received a total of $4,944.03, their fair market value upon arrival. On the basis of figures reported in the July 6, 1964 U. S. Department of Agriculture Boston Daily Report, Fresh Fruit and Vegetable Market News, plaintiff would have received $5,334.25 as fair market value for the peaches on that day if they had been U. S. Extra No. 1, a difference of $390.22 which, together with interest, is the amount of plaintiff's claim.

*Conclusions of Law*

Under well established rules governing claims such as these, see Missouri Pacific Railroad Co. v. Elmore & Stahl, 1964, 377 U.S. 134, 138, 84 S.Ct. 1142, 12 L.Ed.2d 194, defendant as a common carrier owed a duty to plaintiff to exercise reasonable care in handling the shipment and to perform all required transportation services without negligence. Plaintiff establishes his burden of proof when he shows (1) delivery in good condition, (2) arrival in damaged condition and (3) the amount of damages. Whereupon the burden of proof is upon the carrier to show both (1) that it was free from negligence and (2) that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability, such as an act of the shipper himself or the inherent vice or nature of the goods.

---

3. This is not an unusually large proportion.

Plaintiff has failed to make out a *prima facie* case, in that he failed to show any damage to the goods while in transit. For aught that appeared in the evidence, the condition of the fruit in Boston on July 6 was no different than it was when it left California on June 27. The crucial evidence was the inspection certificate at point of origin, in the light of the applicable regulations for grading peaches. With respect to the condition of the fruit, it stated simply that the defects were within tolerance established for U. S. Extra No. 1 grade. So were they upon arrival, else they could not have been graded U. S. No. 1. The standards for U. S. Extra No. 1 and U. S. No. 1 are identical except for color.

Plaintiff contends that the certificate at origin proved the good condition of the fruit when delivered to the carrier. Well, so it may have, to the extent of the peaches' meeting the requirements of the grade given by the inspector, as defined by the regulations. But it could do no more. It was for the most part a description only by reference to the regulations and included no particulars as to the types of defects noted which are tolerable under the regulations. Plaintiff takes the position that mere issuance of the certificate at origin proved delivery in good condition in the sense of the first element of a claim for damages under the Carmack Amendment. In effect plaintiff is contending that the certificate automatically proved better condition at origin than at destination. But § 1622(h) of the Agriculture Marketing Act is clear that a certificate is evidence only of the truth of the statements contained in it. Therefore, whether the certificate at origin proves delivery in good condition depends upon its contents and upon the nature of the loss claimed by the shipper. In the court's opinion, plaintiff's contention overlooks considerations of substantive due process of law.

The case of Condakes v. Southern Pacific Company, D.Mass., 303 F.Supp. 1158 C.A. No. 66–877–J, filed Dec. 17, 1968, relied upon by plaintiff, is not to the contrary. That case involved a shipment of U. S. No. 1 table grapes which were so graded with the notation "defects within tolerance" at origin and found not to meet the requirements of the grade at destination. The court held that the certificate showed delivery in good condition. Applicable regulations as to tolerance for No. 1 grade, however, provided that not more than 2% of the grapes could be seriously damaged, i. e., "wet" in the context of the litigation, and at destination "wetness" ranged from 3% to 12% per lug, with most lugs containing 5% and 7% wet grapes. Under the particular circumstances, the provisions of the regulations themselves proved loss during transit.

The fact that the peaches were assigned a lower grade at destination than at origin does not compel the conclusion that the fruit was damaged en route, in view of the peculiar circumstance in this case that the only difference between the two grades is blush or reddish color which stops developing after the fruit is picked. There was no indication in the evidence that the color on a peach fades or disappears after it has been picked. It may therefore be assumed that there was as much color on the fruit upon arrival as when shipped. Upon comparison of the inspection reports at Boston as to color with § 51.1211 of the regulations, the court concludes that the peaches were properly graded U. S. No. 1 at destination. The government inspection report stated with respect to color, "From 20 to 80%, mostly 25 to 60% of surface pink to red color." The regulation provides, "individual packages may contain not less than 40% of peaches having this amount of color," viz., not less than one-fourth of the surface showing blushed, pink or red color. The other two inspection reports simply described the peaches [4] as having

4. According to the government certificate at destination, the lugs were "Stamped

U.S. No. 1 Red Haven." The significance of this, if any, was ignored at the trial

"⅛ to ⅔ blush color", which would also fall below the requirements of U. S. Extra No. 1. The inspection certificate at origin was as abbreviated with respect to color as in other respects, stating "Most show ½ or more red blush." The court concludes that the inspector at origin was too generous in his grading the peaches as U. S. Extra No. 1 and that they should have been graded U. S. No. 1 in the first place.

Judgment for the defendant, with costs.

at which most of the testimony related to the nature of the bruising of the peaches observed at destination, whether probably due to a shift of the load as argued by plaintiff or "pack bruising" as opined by an expert called as a witness by the defendant.