**HNV CENTRAL RIVER FRONT CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 285–89C.

United States Claims Court.

March 31, 1992.

---

**17.** *Id.* at 23.

Joe R. Reeder, Washington, D.C., for plaintiff. Scott N. Stone and Charles E. Talisman, Washington, D.C., of counsel.

Ellen M. McElligott, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. Michael Knipe, U.S. Dept. of Agriculture, Washington, D.C., of counsel.

## OPINION

MARGOLIS, Judge.

This government contracts case is before the court on cross-motions for summary judgment. Plaintiff entered into a contract to store defendant's grain and four contracts to bag defendant's grain. On summary judgment plaintiff claims past-due fees withheld by defendant for services rendered under the contracts, plus statutory interest. Plaintiff also claims costs for a loading sequence that defendant terminated by rejecting the grain, plus statutory interest. Plaintiff requests the court to dismiss as a matter of law certain counterclaims brought by defendant for quality discounts on sorghum, quality discounts on wheat sold to a third party, and consequential damages for market losses on a grain swap. As an alternative ground for dismissal, plaintiff asserts that the counterclaims have not been subjected to the disputes process pursuant to the Contract Disputes Act ("CDA").

In its response, defendant asserts that plaintiff's claims for misgrading are tort claims, which are beyond the jurisdiction of this court. Defendant also asserts that the inspection agent was mandated by statute, not by contract; consequently no agency relationship existed to impute liability for misgrading to defendant.

Defendant claims that deterioration of the stored grain resulted in plaintiff's breach both of an express contract and of its duty as bailee to care for the grain. On summary judgment, defendant claims that plaintiff is liable for resultant damages as a matter of law. Defendant acknowledges plaintiff's entitlement to past-due fees but asserts that withholding is sanctioned by the storage contract due to plaintiff's offsetting obligation to reimburse defendant for deteriorated grain. In addition, defendant seeks consequential damages for loss-

es it incurred in meeting its grain export obligations when plaintiff's grain was not of suitable quality. Defendant further claims that plaintiff unilaterally, and without justification, terminated performance on the canceled bagging contracts, and defendant is therefore not liable for the costs consequent to these terminations.

After careful review of the parties' motions for summary judgment, and after hearing oral argument, this court adjudicates several basic jurisdictional and legal issues, but finds that the substantive claims rest on disputed issues of material fact inappropriate for summary judgment. Accordingly, this court denies plaintiff's motion for summary judgment, and denies defendant's motion for summary judgment.

## FACTS

Plaintiff HNV Central River Front Corporation ("HNV") and defendant Commodity Credit Corporation ("CCC"), a federally-owned corporation under the purview of the U.S. Department of Agriculture ("USDA"), entered into a contract on June 9, 1986 to store CCC's grain at the Public Grain Elevator ("PGE") in New Orleans, Louisiana. Uniform Grain Storage Agreement ("UGSA") No. A22–3–CCC–943J governed HNV's obligations to receive, store, condition and load grain. Under applicable statutes governing export grain, the Federal Grain Inspection Service ("FGIS") inspected and classified all grain entering and leaving PGE according to federal grading standards. 7 U.S.C. § 77(a)(1). CCC used FGIS-determined grades to assess HNV, as insurer of grain quantity and quality under the UGSA, for changes in the grain's value occurring during storage. As a result of the change in value of the grain, CCC withheld $487,904.13 from HNV in storage and loading fees on this contract.

HNV received four contracts to bag CCC-owned grain. HNV completed Contract No. KCMG–2548, and CCC owes HNV $4,821.03 on the contract. HNV also com-

pleted Contract No. KCMG–2549, and CCC owes $17,078.22 on the contract. CCC subsequently canceled bagging Contract Nos. KCMW–2550 and KCMW–2551 before they were fully performed. CCC owes $41,-661.90 for partial performance of Contract No. KCMW–2551. CCC withheld a total of $63,561.15 in bagging fees on these four contracts.

A contracting officer's final decision on the storage contract was issued October 4, 1988. A contracting officer's final decision on the bagging contracts was issued on April 30, 1990.

## JURISDICTION

Several issues raised by the parties concern the jurisdiction of this court to hear the pending claims. The court finds that the issues raised do not impair the ability of this court to entertain the parties' substantive claims.

*CCC's Counterclaims*

■ HNV asks the court to dismiss CCC's counterclaims totalling $3,068,-396.61. HNV argues that this court must deny jurisdiction as a matter of law because HNV did not have notice of the fully liquidated dollar amounts associated with the claims CCC intended to bring against it prior to the contracting officer's final decision of October 4, 1988. HNV asserts, and CCC does not dispute, that it never received a written claim for a definite amount corresponding to any of CCC's counterclaims except for those associated with one specific grain swap. HNV therefore argues that the claims are not ripe for adjudication by this court pursuant to the CDA. 41 U.S.C. § 609(a)(1).

Taking the facts in the light most favorable to the non-moving party, HNV received notice that CCC would seek compensation for grain deterioration through counterclaims. CCC withheld fees earned by HNV as a set-off to ensure payment of its counterclaims.[1]

---

1. In its request for a contracting officer's final decision dated June 20, 1988, HNV specifically sought a determination "that it will not be responsible for net deficiencies, quality discounts

or other assessments at the time this grain is loaded out [because a]ny alleged discrepancy between the grades of that grain now and the

■ The CDA is silent on what constitutes a claim by the government. 41 U.S.C. §§ 601–613. The CDA states only that claims brought by the government must "be the subject of a decision by the contracting officer." 41 U.S.C. § 605(a). In short, there is no statutory requirement to certify government claims, and the United States Claims Court has jurisdiction provided that the contracting officer's decision is final. *See* 41 U.S.C. § 605(c)(1); *Placeway Construction Corp. v. United States,* 920 F.2d 903, 906 (Fed.Cir.1990).

The Federal Acquisition Regulations ("FAR") define a claim as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or related to the contract." 48 C.F.R. § 33.201 (1990).

■ In a recent decision interpreting the FAR language, the United States Court of Appeals for the Federal Circuit determined that a set-off asserted by the government, though of an indeterminate amount, constituted a government claim such that the contracting officer's denial of the contractor's claim amounted to a final decision justiciable in the Claims Court. *Placeway,* 920 F.2d at 906–07.[2] In effect, *Placeway* required only that the government assert the claim or claims and obtain a final decision of the contracting officer. *Id.* No mention is made of a requirement to provide the contractor with notice of the fully liquidated dollar amount of the government's claims. *See id.*

HNV cites *Keystone Coat & Apron Mfg. Corp. v. United States,* 150 Ct.Cl. 277 (1960), *cert. denied,* 372 U.S. 942, 83 S.Ct. 935, 9 L.Ed.2d 968 (1963), in support of its position. However, in *Keystone,* the contractor received a demand for additional payment from the government after the contract was fully completed, and the government had paid the contractor for its services. *Id.* at 280–82. The *Keystone* court determined that the contracting officer's letter requesting payment did not "apprise the [contractor] that it was a final decision, including findings of fact and notice under the disputes clause." *Id.* at 282. This is clearly not the case here because a contracting officer's final decision was rendered.

HNV and CCC also cite various Board of Contract Appeals ("BCA") decisions.[3] Board of Contract Appeal decisions do not bind this court. Although nonbinding, the BCA cases cited tend to support CCC in stressing the need to advise the contractor of the existence of a government claim and afford a "preliminary attempt to give the [contractor] an opportunity to express an opinion or take a position." *Blaze Construction Co., Inc.,* 90–1 B.C.A. (CCH) ¶ 22,522, at 113,030, 1989 WL 153297 (IBCA No. 2668–A, 1989). HNV had such an opportunity. Consequently, HNV's request to dismiss CCC's counterclaims for lack of jurisdiction is denied.

*Misgrading Claims*

CCC asserts that HNV's claims relating to the misgrading of grain by FGIS sound in tort rather than in contract and therefore are beyond the jurisdiction of this court. As a related argument, CCC asserts that HNV cannot assert its allegations of misgrading as contract claims under the UGSA because FGIS was not CCC's agent.

---

grades given at load-in is due to improper actions of the CCC and FGIS."

2. *Placeway* interpreted the FAR rather than the Office of Federal Procurement Policy ("OFPP") regulations discussed by this court in *Esprit Corp. v. United States,* 6 Cl.Ct. 546, 548 (1984), *aff'd mem.,* 776 F.2d 1062 (Fed.Cir.1985). However, similarities in language between the OFPP regulations and the FAR would demand the same result no matter which document was used to construe the CDA.

3. *See Blaze Construction Co., Inc.,* 90–1 B.C.A. (CCH) ¶ 22,522, at 113,031, 1989 WL 153297 (IBCA No. 2668–A, 1989); *United Aero, Inc.,* 83–1 B.C.A. (CCH) ¶ 16,268, at 80,835, 1983 WL 8413 (ASBCA No. 2697, 1983); *Chandler Mfg. and Supply,* 82–2 B.C.A. (CCH) ¶ 15,997, at 79,313, 1982 WL 43357 (ASBCA Nos. 27030 and 27031, 1982); *Space Age Engineering, Inc.,* 82–1 B.C.A. (CCH) ¶ 15,766, at 78,019, 1982 WL 7104 (ASBCA No. 26028, 1982); *Desert Moving and Storage Co.,* 68–2 B.C.A. (CCH) ¶ 7,243 at 33,686, 1968 WL 742 (ASCBA No. 12665, 1968).

*Tort Claims*

■ CCC argues that HNV is presenting this court with tort claims over which it has no subject matter jurisdiction. CCC asserts that misgrading of grain is a tort of misrepresentation within the meaning of the Federal Tort Claims Act, 28 U.S.C. § 2680(h).

CCC cites a number of cases supporting this proposition. These cases, growing out of *United States v. Neustadt,* 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961), and *Block v. Neal,* 460 U.S. 289, 296–97, 103 S.Ct. 1089, 1093, 75 L.Ed.2d 67 (1983),[4] can be distinguished because they concern tort actions brought directly against the inspection entity rather than the party in contractual privity as here. The cases concern failure of the tortfeasor to disclose material defects or shortcomings resulting in financial loss on a particular transaction.

In its claims, HNV questions the reliability of FGIS determinations as being sufficiently indicative of grain quality to support CCC's assessments for grain deterioration under the UGSA. Courts have previously recognized these types of claims as contract actions. *See Cities Service Co. v. Derby & Co.,* 654 F.Supp. 492, 502 (S.D.N.Y.1987) (citing *Mange v. Unicorn Press,* 129 F.Supp. 727, 729 (S.D.N.Y.1955) and *M. De Matteo Construction Co. v. Maine Turnpike Authority,* 184 F.Supp. 907, 914 (D.Me.1960)) (where the inspection agent acts outside his sphere of competence, his decisions do not necessarily bind the parties under the contract), *aff'd mem.,* 835 F.2d 1429 (2d Cir.1987).

The court does not decide at this juncture whether HNV's claims related to misgrading have merit. However, from the context in which FGIS grading relates to the claims at issue, it is apparent that HNV's claims sound in contract, not in tort, and this court has jurisdiction to review them.

*Agency Requirement*

■ CCC argues that HNV must link FGIS misgrading to its contract with CCC in order to assert its misgrading claims. However, FGIS inspection was mandated by statute rather than contract. Thus, CCC argues, no actual or apparent agency relationship existed between the two government entities that would impute liability for misgrading to CCC.

Using similar language to describe the inspection requirements for inbound and outbound grain, USGA § 7 provides that, where available, "[t]he quantity, class, grade and quality ... shall be determined, on the basis of UGSA Approved Weights ... and on the basis of Official Grain Inspections at the warehouse location."

The UGSA defines official grain inspection as "[s]ampling, testing, grading and certification of grain by official inspection personnel under the United States Grain Standards Act...." UGSA App. 1 at 2. The Grain Standards Act regulates the inspection of all grain shipped in interstate or foreign commerce. 7 U.S.C. § 74(a). Both the UGSA and the Grain Standards Act contemplate that inspections be performed by authorized employees of FGIS or other licensed persons under the authority of the FGIS Administrator. UGSA App. 1 at 2; 7 U.S.C. §§ 75a, 77(b), 79(e)(1).

While FGIS inspections were not specified by contract, inspection of the grain on load-in and load-out was contractually required for the purpose of settlement on load-out of differences in grain quality and quantity. UGSA § 13. HNV's contractual liability for differences in grain value between load-in and load-out was based on these official inspections. UGSA § 12.

Thus, the issues are whether comparable grading standards and procedures were used on load-in and load-out, and whether assigned FGIS grades reflected the actual quality of the grain.[5] To resolve these

---

**4.** *See Carolinas Cotton Growers Association v. United States,* 785 F.2d 1195 (4th Cir.1986); *Cross Bros. Meat Packers, Inc. v. United States,* 705 F.2d 682 (3d Cir.1983); *Nelson v. United States,* 16 Cl.Ct. 510, 515 (1989); *Forsythe Meats, Inc. v. United States Department of Agriculture,*

508 F.Supp. 237 (S.D.N.Y.1981); *Kipf v. United States,* 501 F.Supp. 110 (D.Mont.1980).

**5.** This description of the issues focuses on HNV's overall liability for grain deterioration as calculated by CCC. It does not encompass ancillary claims by HNV that relate to costs in-

issues, it is important only that both parties agreed to use a third party's services to determine HNV's liability under the contract. See UGSA §§ 7, 13. Whether FGIS or some other entity performed the inspection services is immaterial.

HNV cites *Cities Service, supra,* for the proposition that contractor liability cannot be based on inspection procedures that depart from those specified in the contract, regardless of the independent status of the inspector. Although *Cities Service* is not binding on this court, and the case differs somewhat on its facts,[6] it supports the finding that an agency relationship between CCC and FGIS is not required to assert certain of HNV's claims.

The court therefore finds that an agency relationship between CCC and FGIS is not a prerequisite to HNV's assertion of misgrading claims. However, this determination does not automatically confer liability for misgrading on CCC. Nor is it meant to affect later findings regarding either party's responsibilities under the contract.

*Scope of Review*

 CCC asserts that HNV's failure to challenge official grade certificates for sorghum or other grains amounts to an admission that quality and quantity of the grain did in fact change during storage. CCC suggests that HNV should have sought administrative or judicial review of the official grain certificates through the Administrative Procedures Act, 5 U.S.C. §§ 702, 703 and 7 C.F.R. § 800.139(d). CCC maintains that HNV is not asking for review of the certificates, but is asking the court to take judicial notice of discrepancies in grading between load-in and load-out.

The Grain Standards Act states that:

Official certificates setting out the results of official inspection issued and not canceled under this chapter shall be received by all officers and all courts of the United States as prima facie evidence of the truth of the facts stated therein.

7 U.S.C. § 79(d). This language creates a rebuttable presumption that the certificates accurately state the grain's quality and quantity.

The case law is sparse on judicial treatment of inspection certificates—as proof of quality. *Condakes v. Southern Pacific Co.,* 303 F.Supp. 369 (D.Mass.1969), concerns alleged damage of peaches during shipment by rail car, where the certificates issued at origin and delivery constituted the sole proof of damage. The plaintiff relied on an official inspection certificate issued by inspectors licensed by the USDA to prove quality at origin. *Id.* at 370. According to the applicable statutory language, this certificate was to be "received by all officers and all courts of the United States as prima facie evidence of the truth of the statements therein contained." *Id.* at 370 & n. 1 (quoting 7 U.S.C. § 1622(h)). *Condakes* concluded that "[t]he fact that the peaches were assigned a lower grade at destination than at origin does not compel the conclusion that the fruit was damaged en route ..." and that "the inspector at origin was too generous in this grading...." *Id.* at 372–73.

*Condakes* implies that judicial review of alleged misgrading by FGIS inspectors is not necessarily precluded by a requirement to challenge the actual certificates administratively. On the other hand, information contained in the actual certificates will be given the deference demanded by statute. Contrary to CCC's suggestion that there is no basis for review, this court finds that

---

curred by HNV as a result of changes in assigned grades, such as whether CCC can be held responsible for loading and unloading the CAL-RICE TRANSPORT. See the discussion of these claims, *infra.* These claims would likely require finding an agency relationship between CCC and FGIS. An agency theory would have to build on the relationship of CCC and FGIS to their umbrella agency: both FGIS and CCC are agents of the USDA. 7 U.S.C. § 75a; 15 U.S.C. § 714.

6. In particular, the *Cities Service* contract provided that: such independent inspector shall be appointed jointly and the cost of his services shall be shared equally by the parties. All determinations as to quantity and quality made in accordance with the provisions of [the section] shall be conclusive and binding upon both parties.
*Cities Service,* 654 F.Supp. at 494.

review of the misgrading claims is appropriate.

### APPLICABLE CONTRACT

■ CCC stored grain at PGE for several years. During that time, HNV and CCC negotiated new storage contracts annually. The parties forward two versions of the UGSA that purportedly govern the claims at issue.

HNV asserts that a 1983 contract form, with appropriate amendments ("1983 contract"), governs its storage claims. The 1983 contract is the UGSA original signed by both parties in 1986. CCC offers the UGSA that HNV signed in 1988 ("1988 contract"). The 1988 contract became effective on April 1, 1988.

CCC admits that its claims against HNV arose from HNV's failure to load-out grain as required by the UGSA between January and April of 1988. Thus, the events at issue occurred almost exclusively during the pendency of the 1983 contract. Issues concerning the contractual obligations of both parties also fell within the time frame of the 1983 contract. On the other hand, CCC calculated loading order settlements during the summer of 1988, which may properly involve application of the 1988 contract.

Therefore, the 1983 contract will be applied to the events underlying this litigation occurring prior to April 1, 1988. The 1988 contract will be applied to events occurring after April 1, 1988, and any required review of loading order settlements. In this opinion, "the contract" or "the UGSA" refers to the 1983 contract, and "1988 UGSA" refers to the later contract.

### DISCUSSION

The remaining elements of plaintiff's and defendant's motions for summary judgment are addressed below.

*Breach of Express Contract*

■ CCC contends that HNV breached the express grain storage contract (UGSA) by "loading out grain of a quality and quantity grossly deficient in relation to the contractual requirements...." HNV was CCC's bailee for grain stored by PGE and was responsible for caring for the stored grain. CCC asserts that, as the guarantor of grain quality and quantity under the UGSA, HNV was responsible for deterioration of the grain unless due to circumstances beyond HNV's control.

CCC alleges that HNV failed to condition the grain properly, maintain adequate staffing in the warehouse, and store the grain in a safe and sanitary manner. Thus, CCC contends, HNV breached its contractual duty to take the precautions of a reasonably prudent warehouse operator in maintaining the quality and quantity of the grain. HNV contests this characterization of its conditioning, staffing, and storage practices.

A certain amount of grain deterioration was foreseen by the contract. UGSA § 13(a), (b) and (g) enumerate specific settlement procedures to address quality and quantity variances between load-in and load-out. In addition, UGSA § 13(e) pertains to CCC's rejection of grain that it finds unsuitable. A genuine issue of material fact therefore remains as to whether the extent of deterioration in the grain stored at PGE was foreseeable, or whether it exceeded the degree of deterioration contemplated by the parties, resulting in breach of contract. Genuine issues concerning HNV's practices, which the parties dispute, also exist. Summary judgment is denied.

*Storage and Bagging Fees*

■ Plaintiff asks for summary judgment on amounts CCC admits it owes to HNV for services performed:

| | |
|---|---|
| –Past due storage and loading charges: | $487,904.13 |
| –Bagging fees: | $ 63,561.15 |
| TOTAL | $551,465.28 |

CCC acknowledges HNV's entitlement to past-due fees, but asserts that withholding is sanctioned by the storage contract because of HNV's obligations to reimburse CCC for deterioration of the grain.

HNV's actions would have to constitute a serious breach of contract or a violation of program requirements to justify withhold-

ing funds from it. 7 C.F.R. § 1403.8(b)(1). CCC claims that HNV breached its express contract with CCC because, "when CCC ordered [HNV] to load out grain, [HNV] loaded out grain of a quality and quantity grossly deficient in relation to the contractual requirements...." 15 U.S.C. § 714b and c, and the contract, USGA at Supplement 1, ¶ 19 also provide for withholding of money owed HNV.

Accordingly, the court will permit CCC to withhold HNV's past-due charges and fees pending the final outcome of this suit.

*Loading/Unloading* CALRICE TRANSPORT

■■■ Plaintiff requests summary judgment for costs incurred when CCC rejected a sorghum shipment midway through load-out of the grain. HNV maintains that CCC has admitted the validity of HNV's claim for $109,072.86 plus interest, associated with loading and discharging sorghum from the CALRICE TRANSPORT. HNV's source for CCC's admission is an internal document prepared by CCC in anticipation of litigation. Apparently, the government inadvertently gave HNV several copies as part of the document production phase of discovery. CCC invokes work product and attorney-client privilege on the documents.

This court agrees that inadvertent release of the document waives privilege. *See, e.g., In re Sealed Case,* 877 F.2d 976, 980 (D.C.Cir.1989). However, treating the words "FGIS errored [sic] on the load out of sorghum" as an admission conclusive of CCC's liability for the costs of loading and unloading the CALRICE TRANSPORT grossly overstates that language of the document. The court denies summary judgment on this issue.

*Sorghum Quality Discounts*

■■■ HNV asks for summary judgment on CCC's counterclaim for sorghum quality discounts. HNV alleges that CCC cannot prove that the sorghum was properly graded using consistent grading standards and procedures at load-in and load-out, so CCC is not entitled to claimed quality discounts of $1,390,715.51.

As discussed above, the official grain certificates are prima facie evidence of the facts stated therein. 7 U.S.C. § 79(d). HNV thus has the burden of proving that those certificates are inaccurate. The court denies summary judgment because FGIS grading practices and procedures present genuine issues of material fact that could affect the validity of the grade certificates.

*Extra-contractual Grain Sales and Swaps*

■■■ CCC made a number of arrangements to sell and swap grain with other firms in the industry. These arrangements were made completely outside the terms of its contract with HNV. CCC alleges that HNV's failure to maintain grain quality was the underlying cause of the alleged losses it suffered from these arrangements and seeks reimbursement from HNV.

CCC's ability to recover alleged losses on grain sales and swaps requires resolution of at least one genuine issue of material fact: whether HNV's actions breached its express contract with CCC. Accordingly, summary judgment on these issues is denied.

*Cargill Sale*

■■■ HNV requests the court to dismiss CCC's counterclaim based on the quality of wheat that CCC sold to Cargill, Inc. on February 2, 1988. The sale involved 467,552.31 bushels of northern spring wheat in storage at PGE.

The sale was consummated at $3.40/bushel. HNV asserts that the purchase price of the wheat was based on the market value of the original quality reflected in CCC's warehouse receipts. CCC asserts, however, that it was forced to accept a bid at less than the market price because the industry was aware of a quality problem at HNV and was concerned that full recovery of discounts from HNV might not be possible.

HNV argues that it can rely on the terms of the CCC–Cargill contract which specified that "[a]ny settlement of grade variance [was] between [Cargill] and the storing warehouseman." HNV asserts that it made substantial concessions to Cargill

that release it from further obligation to CCC. Specifically, HNV agreed to pay Cargill a $0.40/bushel discount on the wheat CCC sold, and agreed to forego certain storage and loading fees on this grain.

HNV makes the subsidiary argument that the UGSA confines recovery for quantity and quality deficiencies to official grain inspections on load-out. HNV asserts that CCC cannot be compensated since the grain was sold while in storage at PGE and Cargill, rather than removed from the warehouse by CCC.

Citing 1988 UGSA § 9E2, CCC argues that its monetary loss from the load-out of grain inferior to that specified in the contract, which is not rejected but is sold to a third party, is determined by calculating net proceeds for the time and location of the grain (market price). However, that contract provision states only that:

> Values for settlement purposes will be based on cash prices, as determined by CCC, current for the location from which the grain was shipped as of the date of acceptance by the carrier of the final shipment under the applicable loading order except that for grain shipments accepted by CCC which do not meet the quality required by the loading order, the warehouseman may request establishment of (but CCC is not required to establish) applicable discounts at the time the grain is accepted by CCC or at the time the weighted average quality of the unit shipment is determined.

1988 UGSA § 9E2 (emphasis omitted). In short, the contract language does not stretch to encompass the result sought by CCC. Without more, 1988 UGSA § 9E2 does not authorize CCC to be reimbursed automatically for perceived losses from the extra-contractual sale of grain. Summary judgment is denied because of the existence of genuine issues regarding whether the conduct of HNV breached its contract with CCC.

*Cargill Swap*

 On February 24, 1988, CCC swapped 142,402.22 bushels of northern spring wheat stored at PGE for 151,589 bushels of wheat that Cargill had in store at Topeka, Kansas.

The court notes that this CCC–Cargill contract *did not* include a clause confining settlement for grain variance to agreements between Cargill and the warehouseman (such as in the February 2, 1988 sale contract between CCC and Cargill). However, HNV agreed to pay Cargill $0.40/bushel for the wheat involved in the swap, and agreed to forego certain storage and loading fees on this grain.

HNV argues that the concessions given to Cargill release HNV from further obligation to CCC for quality deficiencies on the grain. Especially in the absence of an explicit agreement to the contrary, the court does not understand how HNV's agreement can relieve HNV from its obligations to CCC. The court notes, however, that these obligations have yet to be defined under the HNV–CCC contract or imputed through a proven breach of that contract.

HNV also argues that CCC swapped the grain in place prior to load-out, precluding settlement for grain quality as defined by the UGSA. Once again, the UGSA language cited by CCC does not entitle it to recover absent a showing that HNV breached the contract. Summary judgment is therefore denied.

*Peavey Swap*

 HNV notified CCC on January 20, 1988 that it was unable to supply 257,203 bushels of northern spring wheat of the requisite quality to respond to CCC's loading order of January 15, 1988. When CCC could not make shipment of northern spring wheat using grain in storage at PGE, CCC acquired grain through a swap arrangement with Peavey Co. to meet its immediate needs. CCC claims $200,874.75 in consequential damages resulting from marketplace losses.

HNV had no control over the swap, and did not store any of the grain involved in the swap. HNV argues that nothing in the 1983 contract justifies recovery of consequential damages of this type. HNV cites CCC's internal memo as an admission on this point, but because of the nature of the

document, the court does not recognize CCC's statement as dispositive.

HNV also argues that CCC's claim, under the UGSA, of $878,505.64 for quantity and quality deficiencies on northern spring wheat stored by PGE duplicates the recovery on the wheat involved in the Peavey swap. This is a material issue that would have to be resolved at a later date. Summary judgment is denied.

*Canceled Bagging Contracts*

CCC asks the court to deny HNV's entitlement to consequential termination costs on bagging contracts KCMW–2550 and KCMW–2551, including equipment that HNV purchased to perform these contracts. CCC canceled these contracts after HNV suspended performance, allegedly due to lack of funds.

Genuine issues of material fact, such as whether CCC was justified in withholding fees earned by HNV on the four bagging contracts, govern resolution of HNV's claim. Thus, CCC's request for summary judgment is denied.

### CONCLUSION

The parties' cross-motions for summary judgment are denied.