In re NEMKO, INC., Debtor.

The CHASE MANHATTAN BANK, N.A., Plaintiff–Appellant,

v.

NEMKO, INC., debtor and debtor-in-possession, and United Jersey Bank, Defendants–Appellees.

No. 190–11025–260.
Adv. No. 191–1110 (CBD).
Civ. No. 92CV575 (SJ).

United States District Court,
E.D. New York.

Aug. 13, 1996.

**674**

Howard Seife, Winston & Strawn, New York City, for Plaintiff–Appellant.

Christopher Belmonte, Lane & Mittendorf, New York City, for Defendant–Appellee United Jersey Bank.

JOHNSON, District Judge:

Plaintiff–Appellant The Chase Manhattan Bank, N.A. ("Chase"), brings this appeal from the United States Bankruptcy Court of the Eastern District of New York (the "Bankruptcy Court") pursuant to 28 U.S.C. § 158(a), which grants this Court jurisdiction to hear appeals from the Bankruptcy Court within the Eastern District.

Chase seeks reversal of the Order entered January 16, 1992 by the Bankruptcy Court (Hon. Conrad B. Duberstein) (the "Bankruptcy Court Order") which dismissed Chase's Complaint against Defendants–Appellees United Jersey Bank ("UJB") and Nemko, Inc. (the "Debtor" or "Nemko") and denied Chase's cross-motion for summary judgment. UJB cross-appeals from the portion of the Bankruptcy Court Order which denied UJB's motion for sanctions against Chase under Bankruptcy Rule 9011 and Federal Rule of Civil Procedure 11.

## BACKGROUND

Nemko was formed in August 1984 as a New Jersey corporation which operated out of the home of its principals, Dino and Anna Catozzo, at 164 Konner Avenue, Pine Brook, New Jersey. It was engaged primarily in the temporary employment agency business, providing engineers and other technical manpower to various entities. Shortly thereafter, the Debtor opened two additional offices in Garden City and Jamaica, New York. Beginning in August 1985, the Debtor began the business of repairing, retrofitting and assembling buses under a contract with the General Motors Corporation.

On April 8, 1986, the Debtor entered into a Revolving Loan and Security Agreement (the "Loan Agreement") with UJB. Pursuant to the Loan Agreement, the Debtor granted UJB a first security interest in, among other things, Nemko's accounts receivable, inventory, equipment, machinery and general intangibles. In exchange, UJB agreed to lend the Debtor an amount equal to 80% of its qualified accounts receivable. UJB perfected its security interest by filing a Uniform Commercial Code (UCC) financing statement on April 16, 1986, in the Office of the Secretary of State of New Jersey and the Office of the Morris County Clerk. As of the date of the filing of the Debtor's petition in bankruptcy, the Debtor owed UJB the principal sum of $1,895,922.00.

Sometime between 1985 and 1986, Nemko's Chief Executive Officer and Chief Operating Officer, Dino Catozzo, began negotiating with Toky-u Car Corporation to perform final assembly of the M–4 railway car for the Metro North Railroad. In order to have enough space to complete this work, the Debtor executed a lease on August 1, 1986, with the Brooklyn Navy Yard, in Brooklyn, New York, for Building No. 296, consisting of 144,000 square feet and 40,000 square feet of office space. The lease described the Debtor as "Nemko, Inc., a New Jersey Corp., having an office at 164 Konner Avenue, Pine Brook, New Jersey."

On April 1, 1987, the Debtor entered into a second lease with the Brooklyn Navy Yard for an additional 58,900 square feet of plant space in Building No. 664. This lease described the Debtor as "Nemko, Inc., a New Jersey Corporation having an office at Building No. 296—Brooklyn Navy Yard, Brooklyn, New York." The Debtor converted the Brooklyn buildings to a railcar and bus retrofit center and twenty-two offices.

At around the same time as the Brooklyn expansion, the Debtor leased a billing and storage facility and office at 346 Changebridge Road, Pine Brook, New Jersey. This location consists of approximately 2,000 square feet of office and storage space, with the basement and second floor apartment rented out to residential users. On May 11, 1987, UJB amended its financing statement to reflect the relocation of the Pine Brook office to 346 Changebridge Road. Shortly after leasing space at the Brooklyn Navy Yard, the Debtor closed its Jamaica and Garden City offices but maintained the Pine Brook location.

At his August 15 and 19, 1991 deposition, Dino Catozzo testified that the Pine Brook office was where Nemko's financial, recruiting and marketing work was done. Catozzo Dep. P. 7–8. Mr. Catozzo stated that, even after the leasing of space at the Brooklyn Navy Yard, the Pine Brook office remained the place where Nemko performed all of its accounting and financial functions. *Id.* at 9–10. These financial functions included the preparation of payroll and time sheets, the receipt of monies, the preparation of with-holding taxes, and the payment of invoices. *Id.* at 205. In addition, Mr. Catozzo represented that the Pine Brook office was the place where Nemko's corporate records were maintained. *Id.* at 16.

In a 1988 promotional film, however, the Debtor held out its Brooklyn facilities as its "headquarters." In that film, Anna Catozzo states "we started in our home in New Jersey and then moved. . . ." The narrator of the film thereafter describes the Brooklyn Navy Yard location as the Debtor's current principal place of business.

After the move to the Brooklyn Navy Yard, the following officers of the Debtor were all employed and worked out of Brooklyn: Thomas Bielecki, Vice President, Corporate Finance; Daniel Walits, Vice President, Human Resources; Gary Bousquet, Senior Vice President, Operations–Manufacturing; Robert O'Neil, Corporate Vice President, Engineering and Product Development; and Guy Monaco, Senior Vice President, Operations–Manufacturing (the "Officers"). Although many of the Officers also spent time at the Pine Brook location, none had offices in New Jersey.

Throughout the Debtor's existence, Dino and Anna Catozzo lived in New Jersey. Mr. Catozzo, Nemko's Vice President of Marketing and Sales, worked exclusively in the New Jersey office until 1986. Beginning in 1986, Mr. Catozzo began to spend progressively more time in New York. Catozzo Dep. at 28. By the end of 1989, he was spending 75% percent of his working hours in Brooklyn. The remaining 25% of his time was spent primarily in New Jersey during the morning hours prior to his arrival at the Brooklyn office, or on the weekends. *Id.* at 29. Anna Catozzo maintained an office in New Jersey but spent only portions of two or three days a week there. Although she held the title of President, Mrs. Catozzo never exercised any authority over day-to-day operations or decisions concerning Nemko's business or finances. Mr. Catozzo was the Debtor's chief executive officer and chief operating officer.

Consistent with the move to Brooklyn in 1986, revenue generated by Nemko's New Jersey operations steadily declined through

the end of 1987. By the end of the 1988 fiscal year, the Debtor's revenue generating work was performed almost entirely at its New York facilities.

In January 1989, Chase and the Debtor entered into discussions for short-term "bridge" financing of the Debtor's purchase of machinery and equipment. Chase alleges that all correspondence with the Debtor was directed to the Debtor's Brooklyn office. In addition, the Debtor gave its Brooklyn address on its application for a business checking account with Chase.

In May 1989, Chase was given a security interest in all the Debtor's personal property, including accounts receivable, equipment, machinery and inventory. In May 1989, the Debtor executed two promissory notes to Chase, one in the amount of $300,000.00, and the other in the amount of $600,000.00. Chase perfected its security interest in the collateral by filing UCC financing statements in the Morris County clerk's office in New Jersey on June 23, 1989, the King's County clerk's office in New York on June 5, 1989, the New York Secretary of State's office on July 6, 1989, and the King's County Register of Deeds and Mortgages on July 7, 1989. Furthermore, at the request of Chase, UJB subordinated its lien with respect to the Debtor's machinery and equipment, but not with respect to its accounts receivable or other collateral subject to UJB's security interest. In February 1990, the Debtor restated its obligation to Chase under the original promissory notes and executed two promissory notes to Chase in the amounts of $300,000.00 and $600,000.00.

On March 19, 1990, the Debtor filed a petition for relief under Chapter 11 of the United States Bankruptcy Code. As of the petition date, the Debtor was indebted to Chase in the principal amount of $900,000.00 plus interest, late charges and fees.

### PRIOR PROCEEDINGS

On April 27, 1990, UJB moved the Bankruptcy Court for an order prohibiting the Debtor's use of cash collateral, including the proceeds of accounts receivable subject to UJB's lien. Chase did not take a formal position on the motion at that time.

The Debtor opposed UJB's motion by raising an objection to the validity of UJB's lien, alleging that it had failed to perfect its security interest in the Debtor's accounts receivable because it did not file a UCC financing statement in New York. The Debtor claimed that as of August 1, 1986, its chief executive offices were located at the Brooklyn Navy Yard and, therefore, that New York was the proper place to file a financing statement pursuant to the applicable provisions of the New York Uniform Commercial Code (the "N.Y.U.C.C."). In support of its argument, the Debtor submitted an affidavit from Dino Catozzo, sworn to on April 19, 1990, stating that its chief executive office was located in Brooklyn, New York. Chase took no position on the Debtor's objection.

At a hearing on the motion, a stipulation was entered into by the Debtor, UJB, and Chase which permitted the Debtor to use certain cash collateral represented by the proceeds of accounts receivable to enable it to complete its contract with the New York City Transit Authority (the "NYCTA"). By order of the Bankruptcy Court dated July 12, 1990, the Debtor was permitted to use $529,-537.00 of the proceeds from the NYCTA contract and $130,000.00 from other sources. The cash collateral order was amended by a stipulation joined in by UJB and Chase, and was so ordered by the Bankruptcy Court on December 6, 1990 to allow certain payments to be made to trade creditors of the Debtor. After review of the trial exhibits and documents assembled by UJB, the Debtor ultimately withdrew its objection to the validity of UJB's lien.

The Debtor and UJB moved the Bankruptcy Court by joint application on February 26, 1991, for an order granting relief from the automatic stay to permit the Debtor to pay UJB the proceeds of an account receivable due the Debtor from the NYCTA. On March 11, 1991, Chase commenced an adversary proceeding against the Debtor and UJB, challenging the validity and priority of UJB's lien with respect to the Debtor's accounts receivable. In addition to interposing an answer, UJB filed a motion to dismiss Chase's complaint, or in the alternative, for summary

judgment and sanctions against Chase. In support of its motion, UJB submitted a second affidavit of Dino Catozzo, sworn to on April 11, 1991, which states that at all times the Debtor's chief executive office was located at 346 Changebridge Road, Pine Brook, New Jersey.

At a June 11, 1991 hearing on UJB's motion, the Bankruptcy Court ruled that a grant of summary judgment was premature but granted Chase a request for discovery. On October 18, 1991, Chase filed a cross-motion for summary judgment seeking a determination that it held a validly perfected, first priority lien on all of the personal property and accounts receivable of the Debtor.

On January 15, 1992, the Bankruptcy Court rendered its decision on the parties' pending motions. The Bankruptcy Court Order (i) granted UJB's motion to dismiss the complaint filed by Chase, (ii) denied UJB's motion for sanctions pursuant to Federal Rule of Civil Procedure 11 and Federal Rule of Bankruptcy Procedure 9011, and (iii) denied Chase's cross-motion for summary judgment on its complaint.

Chase now appeals from those portions of the Bankruptcy Court Order which dismissed Chase's complaint and denied its cross-motion for summary judgment. UJB cross-appeals from the portion of the Bankruptcy Court Order which denied its motion for sanctions against Chase.

## DISCUSSION

### I. Standard of Review

■ When reviewing decisions made by the Bankruptcy Court, the district court applies the *de novo* standard of review for questions of law and the "clearly erroneous" standard of review for questions of fact. *See, e.g., In re Dill,* 163 B.R. 221, 224 (E.D.N.Y. 1994); *In re Crysen/Montenay Energy Co.,* 156 B.R. 922, 924 (S.D.N.Y.1993), *aff'd,* 19 F.3d 9 (2d Cir.1994).

In the present case, the facts underlying the issues on appeal are not in dispute. Chase challenges only the Bankruptcy Court's conclusions of law. Because the Bankruptcy Court's ruling was based upon the undisputed facts, the Court reviews its

dismissal of Chase's complaint and its denial of Chase's cross-motion for summary judgment *de novo.* *See In re Males,* 999 F.2d 607, 609 (2d Cir.1993) (*de novo* standard of review applicable in case involving an "interpretation of law to be applied in a bankruptcy dispute").

### II. The Validity and Priority of UJB's Lien

■ In dismissing the third count of Chase's complaint, the Bankruptcy Court reasoned that Chase's actual knowledge of UJB's financing statement filed in New Jersey precluded it from claiming a first priority lien on those assets. Chase argues that the Bankruptcy Court's holding was in error because Chase's knowledge of UJB's lien is irrelevant to a determination of whether or not UJB had properly perfected its security interest.

Section 9–103 of the Uniform Commercial Code, which has been adopted by both New York and New Jersey, governs the proper place of perfection in multiple state transactions. Specifically, N.Y.U.C.C. § 9–103(3)(e) provides that:

> A security interest perfected under the law of the jurisdiction of the location of the debtor is perfected until the expiration of four months after a change of the debtor's location to another jurisdiction, or until perfection would have ceased by the law of the first jurisdiction, whichever period first expires. Unless perfected in the new jurisdiction before the end of that period, it becomes unperfected thereafter and is deemed to have been unperfected as against a person who became a purchaser after the change.

The UCC defines a debtor's location as "his place of business if he has one, at his chief executive office if he has more than one place of business, otherwise at his residence." N.Y.U.C.C.Law § 9–103(3)(d) (McKinney's 1991).

While the Bankruptcy Court acknowledged that UJB must have perfected its lien in the jurisdiction in which the Debtor's chief executive office was located in order to assert a valid security interest in the Debtor's ac-

counts receivable, it declined to rule on the issue. Instead, the Bankruptcy Court held that whether or not UJB had properly perfected its security interest in Nemko's accounts receivable was irrelevant because Chase's actual notice of UJB's lien precluded it from attacking the validity of that lien. Accordingly, even if Chase could establish that the location of the Debtor's chief executive offices had changed, UJB's financing statement would still be effective against Chase.

In so holding, the Bankruptcy Court relied on N.Y.U.C.C. § 9–401(2) which provides:

> A filing which is made in good faith in an improper place or not in all of the places required by this section is nevertheless effective with regards to any collateral as to which the filing complied with the requirements of this Article and is also effective with regard to collateral covered by the financing statement against any person who has knowledge of the contents of such financing statement.

N.Y.U.C.C.Law § 9–401(2) (McKinney's 1991). The Bankruptcy Court specifically rejected Chase's argument that § 9–401(2) does not apply to out-of state filings governed by § 9–103.

This Court finds that the Bankruptcy Court's reliance on § 9–401(2) was erroneous as a matter of law. On its face, § 9–401(2) applies only to situations involving intrastate, and not multistate, filings. Specifically, the Court notes the use of the word "place" in § 9–401(2), as opposed to the use of the word "jurisdiction" in § 9–103(3)(e). In applying § 9–401(2), New York Courts have interpreted the term "place" as referring to the proper location to file financing statements within the state. *See, e.g., In re Measure Control Devices,* 48 B.R. 613 (Bankr.E.D.N.Y.1985) (holding that creditor's security interest in equipment was not perfected because creditor failed to file financing statement with Secretary of State); *In re Karachi Cab Corp.,* 21 B.R. 822 (Bankr.S.D.N.Y.1982) (applying § 9–401(2) where creditor filed financing statement with only the county clerk, despite UCC requirement that financing statement be filed with Secretary of State). Section 9–401(2) is thus directed at initial

filings that were made in an incorrect place in a state.

In addition, this Court finds that *In re Davidoff,* 351 F.Supp. 440 (S.D.N.Y.1972), and *In re Enark Industries, Inc.,* 86 Misc.2d 985, 383 N.Y.S.2d 796 (App.Term 2d Dep't 1976), two cases relied on by the Bankruptcy Court, are distinguishable from the present case. In neither of these cases was the court confronted with the issue which was before the Bankruptcy Court in the present case— the effect of the failure to refile within four months of an alleged change in the debtor's location under N.Y.U.C.C. § 9–103.

Both *Davidoff* and *Enark* dealt with unexpired financing statements. *Davidoff* involved a dispute as to priority between two lien creditors where the alleged first lienor had filed a valid, unexpired New York financing statement with the Clerk's Office in Rockland County, New York, but had not filed a financing statement with the New York Secretary of State. The second lienor was found to have knowledge of the first lienor's secured position, and thus could not prevail simply because the financing statement had been improperly filed. *Davidoff,* 351 F.Supp. at 443.

Similarly, in *Enark* the first lienor had filed a valid, unexpired financing statement with the New York Secretary of State, but not with the Clerk's Office in Suffolk County, New York. The court held that the second lienor had knowledge of the first lienor's valid, unexpired financing statement and was therefore relegated to a second position under N.Y.U.C.C. § 9–401(2). *Enark,* 86 Misc.2d at 987, 383 N.Y.S.2d at 798.

Thus, in both *Davidoff* and *Enark* the first lienor had filed a valid, non-lapsed financing statement. In the present case, instead, the first lienor's financing statement allegedly lapsed under § 9–103(3)(e). The Court is not aware of any case in which § 9–401(2) was applied to revive a financing statement which had lapsed under § 9–103(3)(e).

The United States District Court for the Middle District of Pennsylvania addressed the applicability of U.C.C. § 9–401 where a filing has lapsed in *In re Reisinger,* 146 B.R. 649 (M.D.Pa.1992). In that case, the debtor

granted a security interest in the same collateral to two different creditors. The first creditor initially filed a financing statement at the state level. Later, when he realized the need to do so, he filed at the county level as required by Pennsylvania Uniform Commercial Code § 9–401(a)(3). The second creditor, aware of the first creditor's security interest, subsequently filed financing statements at both the state and county levels. Shortly before the debtor filed for bankruptcy, the first creditor's state financing statement lapsed due to his failure to file a continuation statement five years after the original filing as required by Pennsylvania U.C.C. § 9–403. His county financing statement, however, remained in effect.

At the time of the debtor's bankruptcy filing, both of the second creditor's financing statements remained valid. The court thus held that, due to the first creditor's failure to file a continuation statement, the second creditor was entitled to first priority in the debtor's collateral. *Id.* at 652. In so holding, the court in *Reisinger* noted that the first creditor's position "resemble[d] the position of a party who initially file[d] improperly, but who would be given priority under § 9–401(b) if the error were in good faith and the second creditor had knowledge of the first creditor's interest." *Id.* The Court, however, also found a "critical difference" in that § 9–401(b) requires an error as to the proper place of filing. *Id.* The court therefore held that § 9–401(b) was inapplicable in *Reisinger* because the first creditor was not in error as to the proper place to file, but rather as to the need to file a continuation statement.

Similarly, § 9–401(2) is not applicable in the present case. UJB's original financing statement was properly filed in New Jersey. UJB was therefore not in error as to the proper place of filing. Rather, Chase alleges that UJB's financing statement lapsed pursuant to U.C.C. § 9–103(3)(e) four months after Nemko moved its operations to New York and UJB failed to make a second filing. This Court finds that the Bankruptcy Court's broad interpretation of § 9–401(2) in the present case was unwarranted. Accordingly, UJB cannot rely upon Chase's knowledge of

UJB's lapsed perfection of its lien to defeat Chase's properly perfected security interest in Nemko's accounts receivable.

Chase urges this Court to decide the issue of whether the Debtor moved its chief executive office to New York as a matter of law. The Court declines to do so. This case is thereby remanded to the Bankruptcy Court for reconsideration in light of the foregoing.

### III. *Denial of UJB's Motion for Sanctions*

█ Finally, the Court considers UJB's cross-appeal from the portion of the Bankruptcy Court Order which denied UJB's motion for sanctions against Chase under Bankruptcy Rule 9011 and Fed.R.Civ.P. 11. This Court reviews the Bankruptcy Court's refusal to impose sanctions under an abuse of discretion standard. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990); *Mareno v. Rowe*, 910 F.2d 1043 (2d Cir.1990), *cert. denied*, 498 U.S. 1028, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991).

█ The operative language of Bankruptcy Rule 9011 is virtually identical to that found in Fed.R.Civ.P. 11. The purpose of both of these rules is to deter tactics that abuse the litigation process. *See, e.g., Cinema Serv. Corp. v. Edbee Corp.*, 774 F.2d 584 (3d Cir.1985).

Courts will impose sanctions against an attorney or the party he represents under Bankruptcy Rule 9011 or Fed.R.Civ.P. 11 only when "it appears that a pleading has been interposed for any improper purpose, *or where*, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law." *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir.1985), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).

█ In the present case, the Bankruptcy Court concluded that Chase had a "good faith litigation theory." A good faith litigation theory is a proper basis for denying sanctions. *See Eastway Construction*, 762 F.2d at 254. Furthermore, UJB has failed to

establish that sanctions are warranted based on any improper purpose of Chase. This Court thus finds that the Bankruptcy Court did not abuse its discretion in denying UJB's motion for sanctions against Chase.

### CONCLUSION

The portion of the Bankruptcy Court Order granting UJB's motion to dismiss the complaint filed by Chase against UJB and Nemko and denying Chase's cross-motion for summary judgment on its complaint is hereby REMANDED to the Bankruptcy Court for reconsideration consistent with this opinion. The Bankruptcy Court's denial of UJB's motion for sanctions against Chase is hereby AFFIRMED.

SO ORDERED.